(No. 96071.—

# ALTERNATE FUELS, INC., Appellee, v. DIRECTOR OF THE ILLINOIS ENVIRONMENTAL PROTECTION AGENCY et al., Appellants.

*Opinion filed October 21, 2004.—Modified on denial of rehearing June 16, 2005.*

FREEMAN, J., joined by McMORROW, C.J., and KILBRIDE, J., dissenting.

FREEMAN, J., joined by KILBRIDE, J., dissenting on denial of rehearing.

Lisa Madigan, Attorney General, of Springfield (Gary Feinerman, Solicitor General, and Jerald S. Post, Assistant Attorney General, of Chicago, of counsel), for appellants.

Christine G. Zeman and David M. Walter, of Hodge, Dwyer & Zeman, of Springfield, for appellee.

JUSTICE FITZGERALD delivered the opinion of the court:

The primary question in this appeal is whether a business which has been issued a violation notice under section 31(a) of the Illinois Environmental Protection Act (Act) (415 ILCS 5/1 et seq. (West 2002)) for failure to secure a permit as allegedly required by the Act, and then ceases operations, may bring a declaratory action to test the validity of the alleged violation. Alternate Fuels, Inc. (AFI), filed such an action against the Director of the Illinois Environmental Protection Agency (Agency) and the Agency itself. The circuit court of St. Clair County determined that the declaratory action was

justiciable, found that the Act did not require AFI to secure a permit, and rejected AFI's claim for attorney fees; the appellate court affirmed. 337 Ill. App. 3d 857 (2003). For the following reasons, we affirm the appellate court.

## BACKGROUND

David Wieties, a former Agency employee, was president of Resourceful Environmental Ideas, Inc. (REI), a company located in East St. Louis, Illinois, with the principal objective to produce and sell "alternate fuel." REI was the predecessor company to AFI. On June 14, 1994, Wieties sent a letter to the Agency to determine if AFI's product constituted waste under the Act and therefore required an Agency permit. The subject material consisted of various types of plastics generated by the shredding of empty agricultural chemical containers into chips approximately one inch in size. Prior to shredding, a company named Tri-Rinse, Inc., "triple rinsed" the containers according to United States Environmental Protection Agency and Department of Agriculture guidelines to remove residual agricultural chemicals. AFI would transport the resulting chips to Illinois Power for use as fuel at its Baldwin Power Station. On August 31, 1994, the Agency responded that all materials burned for energy recovery retained their classification as waste under the Act and that a facility receiving this material would require a permit from the Agency.

Following this response, REI filed an appeal with the Illinois Pollution Control Board (Board) on September 29, 1994. The Agency filed a motion to dismiss before the Board arguing that the letter was not a "final determination." On November 9, 1994, REI filed a motion to withdraw the appeal and the Board granted REI's motion.

Illinois Power subsequently requested a revision to its operating permit to burn the alternate fuel at the

Baldwin plant. The Agency denied Illinois Power's application, contending that the alternate fuel was a "waste" pursuant to section 3.53 of the Act (415 ILCS 5/3.53 (West 1994)). According to the Agency, because the material was a "waste," Illinois Power would be functioning as a "pollution control facility" under section 3.32 of the Act (415 ILCS 5/3.32 (West 1994)). As a "pollution control facility," Illinois Power faced significant hurdles to secure a permit.

As part of the permitting process, a pollution control facility must obtain local siting approval. 415 ILCS 5/39.2(a) (West 1994). To obtain local siting approval, the county board or the governing body of the municipality must approve of the facility according to various criteria listed in section 39.2(a) of the Act (415 ILCS 5/39.2(a) (West 1994)). The governing body must hold at least one public hearing within 120 days of the application (415 ILCS 5/39.2(d) (West 1994)) and must generally take final action on the application within 180 days (415 ILCS 5/39.2(e) (West 1994)). Local siting approval expires at the end of two calendar years from the date upon which it was granted. 415 ILCS 5/39.2(f) (West 1994).

Illinois Power appealed the Agency's rejection of its permit application to the Board. The Board's decision, published January 23, 1997, noted that the subject materials are "empty pesticide containers [which] present landfill problems due to their non-degradability" and that "the Illinois EPA has determined that the combustion of the subject material, pursuant to the above-listed conditions specified in the permit applications, will not result in a violation of the Illinois Pollution Control Board rules and regulations." *Illinois Power Co. v. Illinois Environmental Protection Agency*, PCB Nos. 97—37, 97—36 (January 23, 1997). The Board held, "Here, Illinois Power is simply receiving the alternate fuel after it has been processed and transformed by Tri-

Rinse and using it in its boilers." *Illinois Power*, PCB Nos. 97—37, 97—36. The Board noted that the material was "no longer" waste within the meaning of the Act. *Illinois Power*, PCB Nos. 97—37, 97—36. Therefore, Illinois Power was not a "pollution control facility," as defined by section 3.32(a) of the Act, and therefore not required to obtain local siting approval. *Illinois Power*, PCB Nos. 97—37, 97—36.

Soon after the Board's decision, Edwin Bakowski, a manager of an Agency permit section, prepared a memorandum concerning solid waste[1] permitting requirements for alternative fuel processing facilities. The memorandum noted that the Board's decision did not address the regulatory status of the alternate fuel prior to receipt by Illinois Power. The memorandum raised concerns about "the nuisances and speculative accumulation which may occur at alternative fuel processing facilities. The market for waste plastics is not very well established and in some instances these materials could even have a negative market value. The acceptance of unrinsed plastics could also result in the manufacture of unacceptable alternative fuel, onsite nuisances or contamination." The memorandum then noted that the "alternative fuel processing facilities do not appear to be recycling centers" and that the burning of alternative fuel was not recycling. The "proposed options" were to "require permits for alternative fuel processing facilities as solid waste treatment and transfer station facilities" or "require no [Bureau of Land] permits for facilities that only process alternative fuels and address problems with these facilities through enforcement."

The memorandum recommended the first option because "the permit requirements will provide a proactive approach to eliminate environmental problems

---

[1]Under the Act "solid waste" means waste. 415 ILCS 5/3.82 (West 1994).

before they occur by prescribing operating conditions for the facility. It should also be noted that it is difficult to enforce against permit exempt facilities that have nuisance or speculative accumulation problems."

Also after the Board's decision, Illinois Power and AFI, formerly REI, entered into a contract for the sale of alternate fuel, which consisted of the chips from the plastic containers with scrap wood as an additional component. AFI also began contracting with suppliers. Included in the record is an unsigned, undated form contract between AFI and a generic supplier. Under the agreement, the suppliers would make arrangements and bear all costs of transporting nonhazardous fuel-grade material, including wood and plastic, to AFI's facility. AFI would bill the supplier for receipt of the materials based on varying unit prices for the differing materials. Additionally, AFI warranted that it would comply with all laws and regulations and "in the event that the regulatory conditions under which any of the aforesaid requirements or permits change during the terms of this Agreement, and are beyond the control of AFI, AFI shall be released from its obligation to receive the volumes of Supplier's material *** [and] that AFI shall rigorously pursue the necessary modifications to its permit status so that it may continue to perform its obligations under this Agreement."

Four agency representatives inspected AFI's facility on May 7, 1998, and May 22, 1998, including Bakowski and Kenneth Mensing, an Agency manager who formerly supervised Wieties at the Agency. According to Bakowski, the facility was "not a nuisance" and Wieties "appeared to have done his homework. He related a lot of this to hazardous waste and what he thought U.S.E.P.A. meant and things like that." A May 8, 1998, inspection report described the facility as "clean and orderly" and "mainly an area to store plastic materials before and after

granulation." An additional inspection on May 22, 1998, yielded similar results.

In his deposition, Mensing described AFI's facility as a "big metal warehouse building" with a "relatively small piece of equipment that was a granulator or a shredder which was the only piece of equipment there to process the incoming material." The facility was a "clean looking area" with various piles or boxes of materials segregated by supplier or plastic type. Mensing prepared a memorandum of the visit, but his observations "didn't quite fit into, you know, a prepared type of checklist that we had." Mensing explained, "We don't really have a non-hazardous waste storage checklist." He did not mention any permitting violation in his memo. According to Mensing's memorandum, Wieties was "not opposed to a 'recycling permit' and would like to work with the Agency to develop and implement a new recycling permit system." Mensing stated, "If the health and safety *** were a non-issue, that a permit would still be required simply by the verbiage of the statute, that if this is a facility that's storing—you know, treating, storing, or disposing of it, then, you know, a permit should be obtained" regardless of whether the facility poses any sort of environmental threat. Mensing stated that he did not see "anything operationally that caused me any problem."

On July 8, 1998, the Agency issued a violation notice to AFI pursuant to section 31(a)(1) of the Act (415 ILCS 5/31(a)(1) (West 1998)). Under section 31 of the Act, an alleged violator may work with the Agency to correct violations without the involvement of a prosecuting authority such as the Attorney General or a State's Attorney. 415 ILCS 5/31 *et seq.* (West 1998). Within 180 days of discovery of an alleged violation, the Agency shall serve a violation notice upon the alleged violator and a written response shall be required. 415 ILCS 5/31(a)

(West 1998). This notice of violation initiates a series of opportunities for the alleged violator to meet with the Agency and resolve the issue. 415 ILCS 5/31(a) (West 1998). If the parties do not resolve the issue, section 31(b) requires that the Agency provide the alleged violator with notice of its intention to pursue legal action and an opportunity to meet prior to referral to the Attorney General or a State's Attorney. 415 ILCS 5/31(b) (West 1998). If disagreements remain, the Attorney General or a State's Attorney shall serve a formal complaint upon the alleged violator. 415 ILCS 5/31(c) (West 1998).

The instant section 31(a) notice alleged a violation of section 21(d)(1) of the Act (415 ILCS 5/21(d)(1) (West 1998)) because "[w]aste was stored and treated without a permit granted by the Illinois EPA." It also alleged a violation of section 21(e) of the Act (415 ILCS 5/21(e) (West 1998)) because "[w]aste was stored and treated at [AFI's] facility which does not meet the requirements of the Act and regulations thereunder." The notice stated, "Due to the nature and seriousness of the violations cited, please be advised that resolution of the violations may require the involvement of a prosecutorial authority for purposes that may include, among others, the imposition of statutory penalties." The suggested resolution was the submission of a permit application for a waste storage and waste treatment operation to the Agency's Bureau of Land Permit Section by September 30, 1998. To obtain a permit, AFI was required to obtain local siting approval pursuant to the Act. 415 ILCS 5/39.2 (West 1998).

According to Wieties' affidavit, due to the issuance of the violation notice, AFI's primary investors withdrew their support, and its primary supplier withdrew from the agreement in July 1998. AFI thereafter halted its manufacturing operations.

The parties subsequently met on September 15, 1998.

The Agency advised Wieties it deemed the alternate fuel materials as "waste" under section 3.53 of the Act (415 ILCS 5/3.53 (West 1998)). The Act defines "waste," in pertinent part, as follows: " 'Waste' means any garbage, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility or other discarded material ***." 415 ILCS 5/3.53 (West 1998). The Agency interpreted "discarded material" to refer to any material "which is not being utilized for its original purpose." As AFI was not utilizing the alternate fuel material in a manner which was consistent with its original use by the supplier, it was the Agency's position that such material had been "discarded" and was, therefore, a "waste." Wieties and the Agency were not able to resolve the matter.

AFI filed a two-count complaint on November 2, 1998, naming as defendants Mary A. Gade, Director of the Agency, and the Agency.[2] In count I, plaintiff requested a declaration that the materials used by AFI in its manufacturing process were not "wastes" because the materials were not discarded. Count II alleged that AFI was statutorily entitled to recoup all reasonable costs, including attorney fees, because the Agency's interpretation of "discarded material" constituted unauthorized rulemaking under the Illinois Administrative Procedure Act (5 ILCS 100/1—1 et seq. (West 1998)). The complaint also alleged that an actual controversy existed and that the declaratory judgment statute vested the court with the power to hear the dispute. 735 ILCS 5/2—701 (West 1998). The Agency moved to dismiss, arguing that there was no actual controversy ripe for determination because AFI failed to exhaust all administrative remedies. The circuit court denied the motion to

---

[2]Plaintiff also named St. Clair County as a defendant. Summary judgment was entered against St. Clair County, but it is not part of this appeal.

dismiss. The Agency then filed an answer, along with affirmative defenses in which it denied that the trial court had jurisdiction to hear the claim and that the complaint failed to state a claim upon which relief could be granted.

AFI filed a motion for summary judgment against the Director and the Agency on count I. The trial court ruled that there were no genuine issues of material fact and granted AFI's motion, finding that the materials were not "wastes" because they were not discarded. Thereafter, the parties filed cross-motions for summary judgment on count II. The trial court granted the Agency's motion as to count II and denied plaintiff's motion. Both parties appealed, and the appellate court affirmed the rulings of the trial court. 337 Ill. App. 3d 857 (2003). We granted the Agency's petition for leave to appeal on count I. 177 Ill. 2d R. 315. In its brief, AFI requested cross-relief, requesting that we reverse the appellate court and the trial court on count II. 155 Ill. 2d Rs. 315(g), 318(a). Because this appeal from a summary judgment ruling solely presents issues of law, our review is *de novo. First Bank of America, Rockford, N.A. v. Netsch,* 166 Ill. 2d 165, 176 (1995).

## ANALYSIS

The Agency raises two issues on appeal: (1) this case was not justiciable because the declaratory judgment action was not ripe for review until the Agency had concluded its investigatory process, and (2) the Agency properly defined the materials processed by AFI as "discarded materials" which constituted "waste," thus requiring AFI to secure a permit before producing the alternate fuel. In its cross-appeal, AFI contends that the Agency's interpretation of "waste" and its subsequent application of the Act constituted impermissible rulemaking, thus making the state liable for AFI's reasonable costs in the instant action, including attorney fees.

Justiciability

The Agency argues that AFI's claim for declaratory judgment is not justiciable. The Agency specifically contends that because the Agency had not yet finished its investigative process under section 31 of the Act (415 ILCS 5/31 (West 2002)) the matter was not ripe for review. AFI responds that the matter is ripe for review because the Agency had completed its investigation, while AFI was forced to halt its operations and was left with no other avenue to resolve the dispute. We agree with AFI.

" 'Concepts of justiciability have been developed to identify appropriate occasions for judicial action. *** The central concepts often are elaborated into more specific categories of justiciability—advisory opinions, feigned and collusive cases, standing, ripeness, mootness, political questions, and administrative questions.' " Black's Law Dictionary 882 (8th ed. 2004), quoting 13 C. Wright, Federal Practice & Procedure § 3529, at 278-79 (2d ed. 1984). Section 2—701 of the Code of Civil Procedure (735 ILCS 5/2—701 (West 2002)) sets forth the general requirements of a justiciable declaratory action under Illinois law. This section provides that a court

> "may, in cases of actual controversy, making binding declarations of rights, having the force of final judgments, whether or not any consequential relief is or could be claimed, including the determination, at the instance of anyone interested in the controversy, of the construction of any statute *** or other governmental regulation *** and a declaration of the rights of the parties interested. *** The court shall refuse to enter a declaratory judgment or order, if it appears that the judgment or order, would not terminate the controversy or some part thereof, giving rise to the proceeding." 735 ILCS 5/2—701(a) (West 2002).

The declaratory judgment statute must be liberally construed and should not be restricted by unduly technical interpretations. *Netsch*, 166 Ill. 2d at 174. This remedy is used to afford security and relief to the parties

so as to avoid potential litigation. See, *e.g.*, *Netsch*, 166 Ill. 2d at 174. "Our courts have recognized that '[t]he mere existence of a claim, assertion or challenge to plaintiff's legal interests, \*\*\* which cast[s] doubt, insecurity, and uncertainty upon plaintiff's rights or status, damages plaintiff's pecuniary or material interests and establishes a condition of justiciability.' " *Netsch*, 166 Ill. 2d at 175, quoting *Roberts v. Roberts*, 90 Ill. App. 2d 184, 187 (1967).

Here, in the context of a challenge to an administrative action, we specifically consider ripeness, a component of justiciability. The ripeness doctrine is designed " ' "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in arbitrary disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." ' " *National Marine, Inc. v. Illinois Environmental Protection Agency*, 159 Ill. 2d 381, 388 (1994), quoting *Bio-Medical Laboratories, Inc. v. Trainor*, 68 Ill. 2d 540, 546 (1977), quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49, 18 L. Ed. 2d 681, 691, 87 S. Ct. 1507, 1515 (1967); see also *National Park Hospitality Ass'n v. Department of the Interior*, 538 U.S. 803, 808, 155 L. Ed. 2d 1017, 1024, 123 S. Ct. 2026, 2030 (2003). It is well settled that " '[t]he problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.' " *National Marine*, 159 Ill. 2d at 389, quoting *Abbott Laboratories*, 387 U.S. at 149, 18 L. Ed. 2d at 691, 87 S. Ct. at 1515; see also *National Park Hospitality Ass'n*, 538 U.S. at 808, 155 L. Ed. 2d at 1024, 123 S. Ct. at 2030.

As to the first factor, the issue presented is fit for a judicial decision at this time. In contention is the correct

interpretation of "discarded material" in section 3.535 of the Act (415 ILCS 5/3.535 (West 2002)). Both sides have approached this matter in terms of statutory construction, and there is no dispute over the facts. Wieties' discussions with the Agency began in 1994 and involved a number of Agency employees over time. The record clearly demonstrates that the Agency had finished its investigation and had decided AFI stored and treated waste, requiring local siting approval and a waste permit, a stance that has not changed. The Agency performed two inspections of the facility in May 1998. Agency personnel continued their internal discussions regarding AFI and the waste issue, which then culminated in a violation notice. After the Agency issued the violation notice, Wieties responded to and met with the Agency in an unsuccessful attempt at resolving the stalemate concerning the definition of waste. As applied specifically to AFI, the Agency has little incentive to change its definition of "waste" as AFI has closed shop, obviating the need for a permit and potential prosecution. Thus, there is no prospect for further factual development to aid judicial resolution.

As to the second factor, the hardship upon AFI is more than sufficient to render judicial review appropriate at this stage. On June 14, 1994, Wieties, on behalf of REI, sent a letter to the Agency for a waste determination. The Agency responded that REI was treating "waste." After Wieties' company filed an appeal before the Board, the Agency filed a motion to dismiss contending that the response letter was not a "final" decision. Thereafter, Wieties' company filed a motion to withdraw. The legal question with regard to Wieties' company, now named AFI, remained unanswered through 1998, when Wieties' meetings with the Agency continued unsuccessfully. The Agency's interpretation put AFI into a dilemma: secure an allegedly unnecessary permit with the

requisite local siting approval, take a potentially more costly alternative of risking serious penalties by continuing and waiting for the ax of Agency prosecution to fall, or discontinue operations. When AFI chose the third option, the Agency had no incentive to refer the matter for prosecution because there was no longer a continuing violation. Indeed, the Agency has given no indication that it wished to issue a section 31(b) notice, much less prosecute the matter. We also note that AFI has not sought relief in this action to prevent the Agency from doing so.

The practical effect upon AFI of failing to allow judicial review at this time would be to foreclose all access to the courts for a determination of the legal question of whether AFI was processing "waste" under the Act—a question which Wieties has been pursuing for over 10 years. The parties do not dispute that AFI is a viable business entity which was directly affected by Agency action. The Agency's decision affected AFI in a concrete way; the notice of violation caused AFI to lose financing, lose its suppliers, and halt operations, thereby ending AFI's agreement with Illinois Power. Thus, AFI has already felt a direct and palpable injury and has an immediate financial stake in the resolution of the instant action.

We find the primary authority proffered by the Agency, *National Marine, Inc. v. Illinois Environmental Protection Agency*, 159 Ill. 2d 381 (1994), distinguishable. In *National Marine*, the Agency issued a notice informing the plaintiff that it could be potentially liable for a "release or a substantial threat of a release of a hazardous substance on the property" pursuant to section 4(q) of the Act. *National Marine*, 159 Ill. 2d at 383; Ill. Rev. Stat. 1991, ch. 111½, par. 1004(q). This notice was based on the Agency finding "buried drums filled with unknown materials, buried tires and wood which had apparently

been used as fill material, black-stained soil near an underground storage tank riser *** and an abandoned well house." *National Marine*, 159 Ill. 2d at 384. Plaintiff sought a declaration that section 4(q) of the Act was unconstitutional, an injunction enjoining the Agency from enforcement arising from the section 4(q) notice or relying on the factual findings found in the notice, and the issuance of a writ of *certiorari* to review the Agency's record and reverse and quash the section 4(q) notice. *National Marine*, 159 Ill. 2d at 384.

This court noted that "the complaint, in essence, sought to obtain judicial review of the Agency's issuance of the 4(q) notice prior to the Agency's initiation of cost-recovery/enforcement proceedings before the Pollution Control Board (Board) or the circuit court." *National Marine*, 159 Ill. 2d at 385. We found, "at this preliminary stage in the administrative process, it is not clear whether the Agency will even initiate a cost-recovery/ enforcement proceeding against plaintiff before one of these bodies. Clearly, under the circumstances, plaintiff's complaint is premature." *National Marine*, 159 Ill. 2d at 390-91. We reasoned:

"To allow preenforcement judicial review of the Agency's mere issuance of the 4(q) notice would undermine the statutory scheme of the Act. Affording plaintiff judicial review at this preliminary stage in the administrative process could potentially open the door and enable parties 'to litigate separately every alleged error committed by an agency in the course of the administrative proceedings.' [Citations.]

In addition, preenforcement judicial review of the issuance of a 4(q) notice would substantially thwart the legislative purpose of providing expedient containment of environmental pollution. Allowing this type of judicial review prior to the final stage of the administrative process would substantially delay the quick, effective response action called for by the Act. The clean-up process could be delayed by months or even years at great cost to the

environment and public health and safety. Such a result will not be countenanced by this court." *National Marine*, 159 Ill. 2d at 392-93.

The concerns of *National Marine* are not evident in the record. The instant case does not "substantially delay the quick, effective response called for by the Act." The record contains no allegations of any environmental contamination. The salient hazard to the environment caused by the plastics exists only in the actual burning of the plastics, for which Illinois Power has received a permit, and the nonbiodegradable character of the agricultural containers, which AFI is potentially alleviating by processing the containers into alternate fuel. Furthermore, the accumulation of materials was only "speculative." After the Agency issued the notice of violations, AFI discontinued its operations and all further manufacturing of the alternate fuel ceased. This is a case where, as Mensing stated, the environmental hazard is a nonissue. Instead it involves only the "verbiage" of the statute. Indeed, by issuing a violation notice which led to the subsequent halting of operations, the Agency has been successful in abating any potential nuisance. It is difficult to conceive of a benefit to the environment of a continued investigation of a facility where inspections revealed no danger to the environment and where all operations had ceased. Thus, there was no thwarting of the Act's purpose to provide expedient containment of environmental risks.

Additionally, the present relief sought is not similar to that sought in *National Marine*. AFI did not seek the issuance of a writ of *certiorari* to review the Agency's record or to quash the section 31(a) notice. AFI sought nothing precluding the Agency from continuing its investigation, issuing a notice under section 31(b), or referring the matter to a prosecutorial authority under section 31(c). Nevertheless, nothing in the record demonstrates that the Agency sought to further pursue

its investigation of AFI. Additionally, nothing prevented the Agency from continuing its investigation under the Act which could have culminated in a counterclaim in the present action. AFI alleges that the only error the Agency committed was in its interpretation of the Act. Thus, the present action is not "preenforcement," as there is no allegation that AFI sought to evade Agency action, nor is there any indication that the Agency wished to refer a matter concerning a discontinued operation to a prosecutorial authority.

Further, unlike in *National Marine*, the Agency's action here constituted more than a merely preliminary step prior to an eventual final Agency action. As stated, once AFI discontinued its operations, there was no further incentive for the Agency to refer the matter for enforcement over a dispute concerning only statutory interpretation. Unlike in *National Marine*, there was not any alleged environmental contamination. Conceivably, there being no continuing production, AFI would have to wait until the Agency filed a complaint based upon a facility that was no longer in operation. As Mensing stated, it was "speculation" that the Agency would have filed a complaint. As stated by the Agency in its brief, AFI's declaratory judgment action was filed "at a time when it was unclear whether the Agency, through a State's Attorney or the Attorney General, would ever initiate an enforcement proceeding." Furthermore, Mensing stated in his deposition that "if he had just stopped doing it, I don't know if we would have pursued any further enforcement." It is not necessary for AFI to expose itself to further liability by continuing the disputed operations for the Agency to pursue administrative remedies entirely in its control until the Agency had deemed it "final."

Under the circumstances of this case, where Wieties has been attempting to get a formal determination of the

definition of "waste" under the Act for now over 10 years, where there are no allegations of environmental hazard presented in the record, where the Agency had essentially obtained compliance with the Act, where the declaratory action did not additionally seek to enjoin the Agency from pursuing further action, where AFI had no further administrative recourse but to wait for prosecution on its halted operations, and where the resolution of the case depends entirely on a statutory interpretation, the concerns addressed in *National Marine* are not present. We therefore find that the record reveals an actual controversy resting on the parties' conflicting interpretations of the Act which affected plaintiff's pecuniary interest. This matter is ripe for review and thus justiciable.

### Definition of "Discarded Material"

The Agency contends on appeal that AFI was receiving and processing "discarded material" within the plain meaning of the definition of "waste" within section 3.535 of the Act (415 ILCS 5/3.535 (West 2002)), thus requiring AFI to secure a permit. The Agency further argues that the term "discarded" should be construed from the perspective of the supplier, such that a material is considered discarded if it is used for a purpose other than that originally intended by the generator of the material. AFI responds that when the phrase "discarded material" is read in conjunction with section 3.380 of the Act (415 ILCS 5/3.380 (West 2002)), it is apparent that the materials it receives are not "discarded" and, therefore, are not "waste" requiring a permit. The parties agree the Act does not define the term "discarded."[3]

The fundamental principle of statutory construction

---

[3]We note revisions to the Illinois Administrative Code (35 Ill. Adm. Code 721 (2003)), pertaining solely to identification and listing of *hazardous* waste. 27 Ill. Reg. 12760 (adopted June 5, 2003). Under the regulations, a solid waste is defined as discarded mate-

is to ascertain and give effect to the legislature's intent. *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 503-04 (2000). The language of the statute is the most reliable indicator of the legislature's objectives in enacting a particular law. *Hawes v. Luhr Brothers, Inc.*, 212 Ill. 2d 93, 105 (2004). We give statutory language its plain and ordinary meaning, and, where the language is clear and unambiguous, we must apply the statute without resort to further aids of statutory construction. *Michigan Avenue National Bank*, 191 Ill. 2d at 504. We must not depart from the plain language of the Act by reading into it exceptions, limitations, or conditions that conflict with the express legislative intent. *Hawes v. Luhr Brothers, Inc.*, 212 Ill. 2d at 105. Moreover, words and phrases should not be construed in isolation, but must be interpreted in light of other relevant provisions of the statute. *Michigan Avenue National Bank*, 191 Ill. 2d at 504.

Section 21 of the Act lists prohibited acts, stating, in relevant part, "[n]o person shall: *** (d) Conduct any waste-storage, waste-treatment, or waste-disposal operation: (1) without a permit granted by the Agency ***. *** (e) Dispose, treat, store or abandon any waste, or transport any waste into this State for disposal, treatment, storage or abandonment, except at a site or facility

rial. 27 Ill. Reg. 12769 (adopted June 5, 2003). Discarded material is further defined as a solid waste if "it is abandoned in one of the following ways *** [i]t is accumulated, stored, or treated (but not recycled) before or in lieu of being abandoned by being disposed of, burned, or incinerated." 27 Ill. Reg. 12770 (adopted June 5, 2003). Other definitions of solid waste include: "a material is considered a solid waste if it is recycled—or accumulated, stored, or treated before recycling *** if one of the following occurs with regard to the material *** 2) the material is burned for energy recovery." 27 Ill. Reg. 12770—71 (adopted June 5, 2003). The present material does not constitute hazardous waste, nor do the parties argue that this provision could apply to this matter.

which meets the requirements of this Act and of regulations and standards thereunder." 415 ILCS 5/21 (West 2002).

The Agency issued a violation notice alleging a violation of section 21(d)(1) because "[w]aste was stored and treated without a permit granted by the Illinois EPA." It also alleged a violation of section 21(e) of the Act because "[w]aste was stored and treated at [AFI's] facility which does not meet the requirements of the Act and regulations thereunder."

The Act defines "waste" as:

"any garbage, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility or other *discarded material*, including solid, liquid, semi-solid, or contained gaseous material resulting from industrial, commercial, mining and agricultural operations, and from community activities ***." (Emphasis added.) 415 ILCS 5/3.535 (West 2002).

In this section, the Act uses the term "discarded" only as a modifier to the term "material." The Act does not elaborate as to who or what subject exactly performed the discard action. Rather, the focus remains on the object: "material." Given that the Act does not specify the subject, the Agency's proposition—that the modifier "discarded" should be construed from the perspective of the supplier—is not unequivocally erroneous. However, a look at another pertinent portion of the Act demonstrates that the Act retains its focus on the "material" itself as it passes between entities.

The Act uses the term "discarded" in section 3.380 of the Act (415 ILCS 5/3.380 (West 2002)), which reads as follows:

" 'Recycling, reclamation or reuse' means a method, technique, or process designed to remove any contaminant from waste so as to render such waste reusable, *or* any process by which materials that would otherwise be disposed of or discarded are collected, separated or processed and returned to the economic mainstream in the

form of raw materials or products." (Emphasis added.) 415 ILCS 5/3.380 (West 2002).

Under this phrasing the legislature has categorized items that may be recycled, reclaimed, or reused into two main categories: (1) "waste" from which contaminants may be removed and (2) "materials." 415 ILCS 5/3.380 (West 2002). "Materials" are further subdivided into those that are "discarded" and those "materials that would otherwise be disposed of or discarded [which] are collected, separated or processed and returned to the economic mainstream in the form of raw materials or products." 415 ILCS 5/3.380 (West 2002). While the legislature has not defined "discarded materials," the legislature has mentioned what it is not: "materials that would otherwise be disposed of or discarded [which] are *** returned to the economic mainstream in the form of raw materials and products." Thus, materials are "discarded" unless they are returned to the economic mainstream.

Here, AFI was not removing contaminants from the triple-rinsed containers or from wood. The contaminants had been removed by the triple-rinsing process before they arrived at AFI's facility and there is no indication in the record of proposed removal of contaminants from wood. Therefore, the solid at issue is a "material." We next consider whether this material was otherwise discarded or if it was "collected, separated or processed and returned to the economic mainstream in the form of raw materials or products." AFI processes the plastic containers and returns the materials as a "product" into the economic mainstream, as demonstrated by the contract with Illinois Power. Under the Act, the materials are, therefore, not discarded.

The comparison of AFI's facility to the statutory definitions for "recycling center" and "pollution control facility" reinforces this interpretation. Under the Act, " 'recycling center' means a site or facility that accepts

only segregated, nonhazardous, nonspecial, homogenous, nonputrescible materials, such as dry paper, glass, cans or plastics, for subsequent use in the secondary materials market." 415 ILCS 5/3.375 (West 2002).

By contrast, a "pollution control facility" is "any waste storage site, sanitary landfill, waste disposal site, waste transfer station, waste treatment facility, or waste incinerator. This includes sewers, sewage treatment plants, and any other facilities owned or operated by sanitary districts organized under the Metropolitan Water Reclamation District Act." 415 ILCS 5/3.330 (West 2002). The aim of AFI was not to store, landfill, dispose, transfer, treat, or incinerate waste. Rather, AFI shreds the plastic materials that have already been "triple rinsed" by Tri-Rinse, Inc., and sells the chips to Illinois Power. While AFI's facility does not neatly fit into the category of "recycling center" because it does more than simply "accept" materials, AFI's facility retained more characteristics of a "recycling center" than a "pollution control facility," chiefly because it handles "materials" rather than "waste."

In its petition for rehearing, the Agency argues that our interpretation here conflicts with the definition of "recycling" in the Illinois Solid Waste Management Act (415 ILCS 20/1 et seq. (West 2002)). The Agency specifically refers to the definition of "recycling" in section 2.1, which provides:

"[T]he process by which solid waste is collected, separated and processed for reuse as either a raw material or a product which itself is subject to recycling, but does not include the combustion of waste for energy recovery or volume reduction." 415 ILCS 20/2.1 (West 2002).

This provision is inapplicable. As is obvious from its title, the Illinois Solid Waste Management Act governs the disposal of "solid waste." 415 ILCS 20/1 (West 2002). Though the plastic chips are eventually sold to Illinois Power for "energy recovery," we have held that AFI is

not processing "waste" under the Act. Thus, the process creating the chips does not constitute "recycling" under this definition. Furthermore, our holding that AFI's facility is not a "pollution control center" is not to be read as a determination that the facility is a "recycling center" under the Act. Therefore, our interpretation of the Illinois Environmental Protection Act is consistent with the Illinois Solid Waste Management Act.

We therefore reject the Agency's contention that "discarded" is defined solely from the viewpoint of the supplier in that a material is putatively "discarded" as "any material which is not being utilized for its intended purpose" of the generator. There is nothing in the statute which would dictate this definition. Rather, the Act contemplates that materials that may otherwise be discarded by the supplier may be diverted from becoming waste and returned to the economic mainstream.

On rehearing, the Agency contends that this court's interpretation of the Act is out of step with a series of federal court decisions construing the term "discarded material" contained in a similar definition of "solid waste" in the federal Resource Conservation and Recovery Act of 1976 (RCRA). 42 U.S.C. § 6901 *et seq.* (2000); 42 U.S.C. § 6903(27) (2000) (defining "solid waste"). We disagree and find our application of the Act to AFI's facility is in harmony with the RCRA.

We initially note that under basic rules of statutory construction, we give statutory language its plain and ordinary meaning, and, where the language is clear and unambiguous, we must apply the statute without resort to further aids of statutory construction. *Michigan Avenue National Bank*, 191 Ill. 2d at 504. Because we find that the plain language of the Act does not require AFI to secure a permit, a review of decisions construing a similar statute is not necessary. Nevertheless, a review of the RCRA definition cited by the Agency and of cases

construing it does not persuade us that a different result is warranted.

The RCRA establishes a regulatory structure overseeing the safe treatment, storage and disposal of hazardous waste. *American Petroleum Institute v. United States Environmental Protection Agency*, 906 F.2d 729, 732 (D.C. Cir. 1990). Congress' "overriding concern" in enacting the RCRA was to establish the framework for a national system to insure the safe management of hazardous wastes. *United States v. ILCO, Inc.*, 996 F.2d 1126 (11th Cir. 1993). Before the material can be a "hazardous waste" subject to the RCRA, it must first meet the RCRA's definition of "solid waste," as well as additional requirements pertaining to the hazardous nature of the waste. 42 U.S.C. § 6903(5) (2000) (defining "hazardous waste"). Under the RCRA, the term "solid waste"

"means any garbage, refuse, sludge *** and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities ***." 42 U.S.C. § 6903(27) (2000).

While this provision is virtually identical to the Act's definition in section 3.535 (415 ILCS 5/3.535 (West 2002)), the Agency's argument ignores our reliance on section 3.380 of the Act to determine whether the material at issue was "discarded material." 415 ILCS 5/3.380 (West 2002). Accordingly, the Agency's present argument on rehearing suffers from the failure to cite a parallel provision of the RCRA which would similarly guide our interpretation of the term "discarded material."

Furthermore, the RCRA grants the United States Environmental Protection Agency (USEPA) enforcement powers and authority to promulgate regulations establishing a comprehensive management system for hazardous wastes. 42 U.S.C. §§ 6921 through 6939b (2000). For instance, the USEPA has promulgated regulations under the RCRA, which further define the phrase "solid waste"

as any "discarded material" and it further defines "discarded material." 40 C.F.R. Pt. 261.2 (2003). Notably, this definition of "discarded material" includes certain materials which are "[b]urned to recover energy" or are "[u]sed to produce a fuel or are otherwise contained in fuels (in which case the fuel itself remains a solid waste)." 40 C.F.R. Pt. 261.2(c)(2) (2003). Moreover, the USEPA has also expressly explained that this regulatory definition applies only to wastes that are hazardous. Section 261.1(b)(1) states:

> "The definition of solid waste contained in this part applies only to wastes that also are hazardous for purposes of the regulations implementing subtitle C of the RCRA. For example, it does not apply to materials (such as non-hazardous scrap, paper, textiles, or rubber) that are not otherwise hazardous and that are recycled." 40 C.F.R. § 261.1(b)(1) (2003).

Thus, the RCRA definition of "solid waste" is distinguishable from the case at bar because of its *a priori* reflection of Congress' "overriding concern" with hazardous materials. There is no dispute that the materials that AFI processes are not "hazardous." When the plastic containers arrive at AFI's facility they have already been "triple-rinsed" by Tri-Rinse, Inc. Thereafter, the plastic containers are shredded into chips and then sold to Illinois Power. The remaining potential danger posed by the plastic derives from the burning of the plastic. However, that concern has been addressed by the Agency's permit issuance to Illinois Power.

The Agency's proffered cases are also inapposite because of their procedural posture. In each case, the courts reviewed USEPA regulations or orders that were made pursuant to the statute regarding facilities that handled hazardous wastes. *Owen Electric Steel Co. of South Carolina, Inc. v. Browner*, 37 F.3d 146 (4th Cir. 1994) (reviewing USEPA order concerning whether a slag processing area within a facility that treated, stored,

or disposed of hazardous waste was a solid waste management unit); *United States v. ILCO, Inc.*, 996 F.2d 1126 (11th Cir. 1993) (reviewing a USEPA regulation as applied to smelting of spent batteries to produce lead ingots which produced several specific hazardous wastes); *American Mining Congress v. United States Environmental Protection Agency*, 907 F.2d 1179 (D.C. Cir. 1990) (reviewing USEPA rule relisting as hazardous six wastes generated from metal smelting operation); *American Petroleum Institute v. United States Environmental Protection Agency*, 906 F.2d 729 (D.C. Cir. 1990) (reviewing USEPA rule exempting the slag residues that result from the treatment of "KO61" in zinc smelters from the RCRA's restrictions on land disposal of hazardous wastes); *American Mining Congress v. United States Environmental Protection Agency*, 824 F.2d 1177 (D.C. Cir. 1987) (reviewing USEPA regulation that amended the definition of "solid waste" to establish and define the Agency's authority to regulate secondary petroleum and mining materials reused within an industry's ongoing production process). In each case, the USEPA argued that its specific interpretation was entitled to deference under a *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 81 L. Ed. 2d 694, 104 S. Ct. 2778 (1984) analysis. In short, the courts determined if the USEPA regulations or orders were a "permissible" or "reasonable" construction of the definition of "discarded" under the RCRA which were entitled to deference under *Chevron*. *Owen Electric Steel Co.*, 37 F.3d at 150; *ILCO*, 996 F.2d at 1130; *American Mining Congress*, 907 F.2d at 1186; *American Petroleum Institute*, 906 F.2d at 740; *American Mining Congress*, 824 F.2d at 1182. In contrast to the federal cases, the Agency does not argue that its interpretation of "discarded material" in this litigation is entitled to the same deference under the *Chevron* analysis. Furthermore, the Agency points to

no regulation, federal or otherwise, that further defines "discarded materials" which would apply to the present nonhazardous material. Therefore, these cases are distinguishable.

We note that this may not be the final word on whether this type of industry may remain outside of the Agency's purview. As AFI's counsel stated at oral argument before this court, the Agency may deem this industry worthy of regulation through a properly promulgated regulation which further defines "discarded materials." Until such a clarifying regulation is in place, the plain meaning of the Act does not dictate that the present materials are "discarded" and therefore "waste." Hence, we find that AFI is not a "pollution control facility" requiring a permit which would further require local siting approval.

### Attorney Fees

In its cross-appeal, AFI contends that the Agency's interpretation of "waste" constituted impermissible rule-making, thus making the state liable for AFI's attorney fees in the instant action. The Agency responds that it was merely interpreting the statute as it applied to this particular case, rather than engaging in any formal rule-making. We agree with the Agency.

Section 10—55(c) of the Illinois Administrative Procedure Act (5 ILCS 100/10—55(c) (West 2002)) provides, in pertinent part, as follows:

> "In any case in which a party has any administrative rule invalidated by a court for any reason, including but not limited to the agency's exceeding its statutory authority or the agency's failure to follow statutory procedures in the adoption of the rule, the court shall award the party bringing the action the reasonable expenses of the litigation, including reasonable attorney's fees." 5 ILCS 100/10—55(c) (West 2002).

The Administrative Procedure Act further includes the following definition of a "rule":

" 'Rule' means each agency statement of general applicability that implements, applies, interprets, or prescribes law or policy, but does not include (i) statements concerning only the internal management of an agency and not affecting private rights or procedures available to persons or entities outside the agency, (ii) informal advisory rulings issued under Section 5—150, (iii) intra-agency memoranda, (iv) the prescription of standardized forms, or (v) documents prepared or filed or actions taken by the Legislative Reference Bureau under Section 5.04 of the Legislative Reference Bureau Act." 5 ILCS 100/1—70 (West 2002).

AFI has failed to demonstrate that the Agency's interpretation of "discarded material" as "any material which is not being utilized for its intended purpose" is "a statement of general applicability." AFI cites intraagency memoranda, and remarks taken from the depositions of Ed Bakowski and Kenneth Mensing that this interpretation was to provide "guidance" to the regulated community. Such statements do not affect private rights or procedures available to specific entities outside the Agency. 5 ILCS 100/1—70(i) (West 2002). AFI points only to the deposition testimony of Kenneth Mensing which states that a violation notice was issued to one business other than AFI, using the same interpretation of "discarded material." Mensing stated that this business elected to secure a permit rather than challenge the violation notice. However, further details of the Agency's application of this interpretation to this business are not available in the record. Given the paucity of information pertaining to the second business, as well as the lack of any information in the record concerning Agency action pertaining to the business community at large, we find the record is devoid of any indication that the Agency's interpretation of "discarded material" was a statement of general applicability.

Additionally, nowhere in the record has AFI demonstrated that the Agency exceeded its statutory authority

in merely interpreting the Act and issuing a notice of violations premised upon that interpretation, nor could it. The Agency here was interpreting a statutory term, "discarded material," based on a particular set of facts, and it was entitled to do so. We further note that this interpretation was not manifestly erroneous, as the Board in the *Illinois Power* decision (*Illinois Power Co. v. Illinois Environmental Protection Agency*, PCB Nos. 97—37, 97—36 (January 23, 1997)) noted that the material was "no longer" waste by the time it arrived at the Baldwin Power Plant. While the Agency's interpretation of the Act was ultimately incorrect, no statutory provision prevents the Agency from making a mere interpretation.

CONCLUSION

We find that plaintiff's claim was justiciable, that AFI was not processing "waste" in the form of "discarded material," and that AFI is not entitled to attorney fees because the Agency's interpretation was not one of "general application." Accordingly, we affirm the appellate court's judgment affirming the trial court's granting of summary judgment for plaintiff on count I and for defendant on count II.

*Appellate court judgment affirmed.*

JUSTICE FREEMAN, dissenting:

I express no opinion on the majority's resolution of the underlying issues of this case, because I do not agree with the threshold conclusion that we should be considering the case at all. Although the majority's reasoning to the contrary is not without some sympathetic appeal, I do not believe that the instant action is ripe.

The facts which I consider to be pertinent to the analysis may be stated succinctly. (1) AFI started up its operation. (2) The Illinois Environmental Protection Agency (Agency) issued AFI a "violation notice," under section 31(a) of the Act (415 ILCS 5/31(a) (West 1994)),

in which the Agency alleged that AFI was treating and storing "waste" without a permit. (3) AFI *voluntarily* ceased its operations. (4) AFI filed the instant declaratory judgment action in the circuit court, arguing that the materials in question were not waste and requesting that the circuit court enter an order stating that "the allegation stated in the above-described violation notice issued to [AFI] are [*sic*] contrary to the law."

As the majority acknowledges, a section 31(a) violation notice carries no legal repercussions. For the Agency to have attempted to hold AFI liable for its alleged violation of law, the Agency would have had to issue AFI a notice of its intent to pursue legal action under section 31(b) (415 ILCS 5/31(b) (West 1994)) and thereafter referred the case to the Attorney General or State's Attorney under section 31(c) (415 ILCS 5/31(c) (West 1994)). The Attorney General or State's Attorney would have had to file a formal complaint against AFI. 415 ILCS 5/31(c) (West 1994). There would have followed a proceeding before the Pollution Control Board. Only if the Board ruled against AFI would any legal consequences have attached.

The section 31(a) notice is merely the first step in this process. It is designed to put the recipient on notice that there may be a problem, nothing more. It is not a final determination of culpability—indeed, it is not even a formal complaint. And as this court has previously stated, "[a]n agency's preliminary, investigative action is not a final agency decision ripe for judicial review. [Citation.] Notifying a party that it is subject to an investigation which may potentially lead to the institution of an action against that party does not create a claim capable of judicial resolution." *National Marine, Inc. v. Illinois Environmental Protection Agency*, 159 Ill. 2d 381, 389 (1994). Thus it would seem that AFI's complaint in this case ought to have been dismissed. But the majority

distinguishes *National Marine*, thus affirming the ripeness doctrine in theory, but determining that it should not forestall AFI's suit in the instant case.

I find *National Marine* indistinguishable with regard to the relevant facts. In both *National Marine* and the instant case, the Agency issued a preliminary notice of potential liability for an environmental violation. In each case, the party to whom the notice was issued brought suit in the circuit court. Both alleged violators claimed that they were harmed by the mere issuance of the preliminary notices. But in *National Marine*, as here, the notice was not a final adjudication, and moreover it was "not clear whether the Agency will even initiate a cost-recovery/enforcement proceeding against plaintiff." *National Marine*, 159 Ill. 2d at 390. Therefore, this court concluded that the dispute was not yet ripe because, I repeat, "[a]n agency's preliminary, investigative action is not a final agency decision ripe for judicial review. [Citation.] Notifying a party that it is subject to an investigation which may potentially lead to the institution of an action against that party does not create a claim capable of judicial resolution." *National Marine*, 159 Ill. 2d at 389.

The majority raises several points in support of its conclusion that *National Marine* does not guide our result in the instant case. First, the majority contends that the "concerns" mentioned in *National Marine* are not implicated in the present case, because "[t]he instant case does not 'substantially delay the quick, effective response called for by the Act.' " 215 Ill. 2d at 235. This is because, according to the majority, there are "no allegations of any environmental contamination" in the record. Here the majority comes perilously close to assuming what AFI is trying to prove, *i.e.*, that AFI committed no environmental contamination. It is clear, however, that the section 31(a) notice charged AFI with,

*inter alia,* storing "waste" without a permit. The fact that AFI voluntarily ceased its shredding operations does not permit us to conclude as a matter of law that the storage of waste has wholly ceased.[4] Thus, this allegation of environmental contamination might indeed be ongoing notwithstanding AFI's voluntary cessation of operations. The majority's speculation that the "salient hazard to the environment" consisted "only" of "the actual burning of the plastics" (215 Ill. 2d at 235) ignores the fact that the Agency charged AFI with conduct unrelated to the burning of the plastics. Indeed, the majority appears to be telling the Agency, as a matter of law, what is and is not a "salient hazard to the environment." In my view, this is both extraordinary and unwarranted.

The majority also argues that this case is distinguishable from *National Marine* because

> "AFI sought nothing precluding the Agency from continuing its investigation, issuing a notice under section 31(b), or referring the matter to a prosecutorial authority under section 31(c). *** Thus, the present action is not 'preenforcement,' as there is no allegation that AFI sought to evade Agency action, nor is there any indication that the Agency wished to refer a matter concerning a discontinued operation to a prosecutorial authority." 215 Ill. 2d at 235-36.

See also 215 Ill. 2d at 233 ("We also note that AFI has not sought relief in this action to prevent the Agency from" issuing a section 31(b) notice or prosecuting AFI).

This argument is also unconvincing. Contrary to the

---

[4]The majority cannot justify such a conclusion by citing to its determination on the merits that the matter in question was not "waste." This would be equivalent to saying that the case is ripe simply because we decided the underlying issue against the agency. This would eviscerate the ripeness doctrine, as any litigant seeking to challenge any administrative agency's initial notice could argue that they should win as a matter of law. This court would be placed in the absurd position of having to decide the merits of a case in order to determine whether the case was ripe for adjudication.

majority's characterization, the instant action is clearly an attempt by AFI to evade Agency action. If not, what would be the point of their filing the declaratory judgment action? This point is underscored by the very relief AFI sought in its complaint: that the circuit court enter an order stating that "the allegation stated in the above-described violation notice issued to [AFI] are [sic] contrary to the law." Clearly, such an order—that the allegations in the section 31(a) notice are *contrary to law*— would indeed preclude the Agency from attempting to prosecute AFI for the conduct alleged therein, now or ever. Indeed, as the Agency warns in its brief to this court, declaring the very allegations "contrary to law" could effectively insulate from prosecution not just AFI, but the entire industry of which AFI is a part—a possibility that this court ought not to ignore.

Finally, the majority contends that "unlike in *National Marine*, the Agency's action here constituted more than a merely preliminary step prior to an eventual final Agency action." 215 Ill. 2d at 236. I must disagree. From the Agency's point of view, that is indeed all that it had done. The fact that AFI voluntarily ceased its operations does not somehow convert the Agency's action from a preliminary step to a final adjudication. As the majority itself noted in the paragraph immediately preceding, the Agency had yet to "continu[e] its investigation, issu[e] a notice under section 31(b), or refer[ ] the matter to a prosecutorial authority under section 31(c)." 215 Ill. 2d at 235. The section 31(a) notice is clearly a mere preliminary step in the statutory scheme. The fact that the Agency might not ever have taken these subsequent steps does not distinguish this case from *National Marine*. See *National Marine*, 159 Ill. 2d at 390 ("it is not clear whether the Agency will even initiate a cost-recovery/enforcement proceeding against plaintiff").

Thus, I conclude that the majority's attempted

distinctions of *National Marine* are without a difference as far as the legal principles involved.

Moreover, even if I agreed with the majority that *National Marine* was distinguishable, and analyzed the case from first principles, I still would not join its conclusion. The majority's underlying concern is that a party who is the target of an administrative action must be allowed to have its day in court. I agree with the majority that a party must *at some point* be able to seek redress in the courts for any administrative action against it. However, the ripeness doctrine does not deprive a litigant of access to the courts. Rather, it controls the *timing* of that access so as to avoid premature litigation and to avoid unnecessary abstract disagreements and entanglement by the courts in agency proceedings. See *National Marine*, 159 Ill. 2d at 388, quoting *Bio-Medical Laboratories, Inc. v. Trainor*, 68 Ill. 2d 540, 546, 370 N.E.2d 223 (1977), quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49, 18 L. Ed. 2d 681, 691, 87 S. Ct. 1507, 1515 (1967) (" 'The basic rationale of the ripeness doctrine *** "is to prevent the courts, through avoidance of adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties" ' ").

The majority is concerned that if the ripeness doctrine were invoked to preclude the instant suit it might truly operate to bar AFI from court, however, because the Agency might never take the subsequent steps necessary to institute enforcement proceedings based on the violation notice. See 215 Ill. 2d at 233. This argument is not without some intuitive force. But in the end it proves too much, as the same argument could be made by *any* litigant to challenge an initial notification

that an agency might institute proceedings against that litigant. It is never a foregone conclusion that an agency will seek to hold an offender accountable. Thus to accept this concern as a general exception to the ripeness doctrine would swallow that rule.

The majority suggests that this case is different from most, however, because "the Agency had no incentive to refer the matter for prosecution because there was no longer a continuing violation." 215 Ill. 2d at 233. First, as I previously noted, I do not believe that it is possible to conclude as a matter of law that there was no continuing violation, in that among the allegations in the section 31(a) notice was *storage* of waste without a permit. But even assuming, *arguendo*, that we could conclude as a matter of law there was no continuing violation, I would question the significance which the majority attaches to this fact. According to the majority's reasoning, a party who will never have a final agency decision entered against it may utilize Illinois courts to challenge the basis of the abortive investigation against it—even though a party which is *actually* facing the possibility of legal action cannot. Such a result is incongruous. In addition to the question of ripeness, it is far from clear to me that a party would have *standing* to attack the content of a preliminary notice—which is, again, not even a formal complaint (see 415 ILCS 5/31(c) (West 2002))—in an investigation which has gone nowhere and never will go anywhere. I believe it is unwise to allow a party to use the courts of this state to challenge allegations in the investigative process of a proceeding which will never move forward to impose liability.

Notwithstanding the above, AFI is in a somewhat sympathetic position because even though the section 31(a) notice carried no *legal* consequences, there were real-world implications associated with its issuance. At least some of AFI's investors "pulled out," as did its

primary supplier. AFI subsequently made the voluntary decision to terminate operations. However, the United States Supreme Court has specifically stated that such by-products of the institution of proceedings do not obviate the ripeness doctrine.

"The impact of the initiation of judicial proceedings is often serious. Take the case of the grand jury. It returns an indictment against a man without a hearing. It does not determine his guilt; it only determines whether there is probable cause to believe he is guilty. But that determination is conclusive on the issue of probable cause. As a result the defendant can be arrested and held for trial. [Citations.] The impact of an indictment is on the reputation or liberty of a man. The same is true where a prosecutor files an information charging violations of the law. *The harm to property and business can also be incalculable by the mere institution of proceedings. Yet it has never been held that the hand of government must be stayed until the courts have an opportunity to determine whether the government is justified in instituting suit in the courts. Discretion of any official may be abused. Yet it is not a requirement of due process that there be judicial inquiry before discretion can be exercised. It is sufficient, where only property rights are concerned, that there is at some stage an opportunity for a hearing and a judicial determination.*

\* \* \*

The determination of probable cause in and of itself had no binding legal consequence \*\*\*. It took the exercise of discretion on the part of the Attorney General, as we have pointed out above, to bring it into play against appellee's business. Judicial review of such a preliminary step in a judicial proceeding is so unique that we are not willing easily to infer that it exists." (Emphasis added.) *Ewing v. Mytinger & Casselberry, Inc.,* 339 U.S. 594, 598-602, 94 L. Ed. 1088, 1093-95, 70 S. Ct. 870, 872-74 (1950).

The majority notes that upon receipt of the section 31(a) notice, AFI was forced to choose between (a) getting a permit, (b) operating without a permit, or (c) shut-

ting down.[5] 215 Ill. 2d at 232-33. I believe that there is no question that if AFI had chosen option (b), and were still operating its business—even if investors and its main supplier had pulled out—this court would find *National Marine* indistinguishable and we would rule that the instant suit was unripe. The only difference between that case and the case at bar is the majority's guess that in this case the Agency will probably not advance the proceedings. It is certainly not impossible that the proceedings could continue in this case, however, just as there was no guarantee that they would continue in *National Marine*. In both cases, whether the suit would proceed would depend on the exercise of the officials' discretion. But in the instant case, because of the majority's prognostication about the *likelihood* that the officials will exercise their discretion in favor of prosecution, the doctrine of ripeness is overridden. I do not agree, and accordingly I respectfully dissent.

CHIEF JUSTICE McMORROW and JUSTICE KILBRIDE join in this dissent.

## DISSENT ON DENIAL OF REHEARING

JUSTICE FREEMAN, dissenting:
I believe that rehearing ought to have been granted in this case, for two reasons. First, the membership of this court changed between the issuance of the original

---

[5]The implication that it was unfair to require AFI either to incur the expense of obtaining a permit or to "risk[ ] serious penalties by continuing and waiting for the ax of Agency prosecution to fall" (215 Ill. 2d at 233) is ameliorated by noting that even if the "ax" had indeed fallen, and the Agency had succeeded in proving that AFI had violated the permit requirement, AFI still would have had the opportunity to "show that compliance with the Board's regulations would impose an arbitrary or unreasonable hardship." 415 ILCS 5/31(e) (West 2002).

opinion and the disposition of the petition for rehearing. Justice Rarick, a member of the majority, retired and was replaced by Justice Karmeier. Because the six remaining participants in the original decision split 3-3 on what action to take on the petition, it was necessary for Justice Karmeier to vote on the petition for rehearing to break the deadlock. Given that a justice was required to begin participating in the case at the petition for rehearing stage, I believe we ought to have granted the petition, in order to have the benefit of full briefing and discussion of the issues in the case, and specifically those concerns raised in the petition for rehearing. I see no harm in at *least* requesting a response from AFI before taking action, but the majority declines to take even this minor step.

Second, this is not a case in which the petition for rehearing was of no weight, or raised concerns already adequately addressed by the original majority opinion. A comparison of the original disposition and the opinion as modified on denial of rehearing reveals that the majority extensively modified its opinion in response to the EPA's arguments upon rehearing. I do not intend to fault the majority for taking the petition for rehearing seriously; quite the contrary. But the fact that the majority found such extensive revisions and additions to be necessary serves to underscore my position that the better approach would have been to grant the petition for rehearing, in order to have the benefit of full briefing and discussion of the issues.

Finally, I note that the petition was filed more than six months ago—and thus, the majority's choice to foreclose additional briefing and argument cannot even claim the relatively minor virtue of speedy disposition of the petition.

The above observations would be true even if I agreed with the majority that the modifications adequately dealt

with the petition. I do not. I feel compelled to note the flaws in the majority's modifications not only to the justiciability issue, upon which I originally dissented in this case, but also on the modifications to the majority's discussion of the merits of the case.

On the justiciability issue, the majority has inserted on denial of rehearing the suggestion that AFI and its predecessor have been "attempting to get a formal determination of the definition of 'waste' under the Act for now over 10 years" (215 Ill. 2d at 236-37). This overstates the case a bit, in my opinion. AFI has known the Agency's position, that the materials it was processing are "waste," since 1994. AFI simply does not *like* the Agency's position, and has been berating the Agency to *change* its position, for 10 years. The majority's statement also fails to take into account that AFI's predecessor withdrew its 1994 appeal, rather than attempting to obtain a ruling from the Board, calling the 10-year mark further into question.

Regarding the merits of the case, the majority now simply assumes what it purports to have proven. The central question is whether the empty plastic fertilizer containers which AFI was processing are "waste" within the meaning of the statute. The majority concludes, and I agree, that the containers are "waste" only if they are "discarded materials." 215 Ill. 2d at 239-40. The majority looks at the definition of "recycling, reclamation, or reuse," and determines that materials are not "discarded" if they are instead " 'collected, separated or processed and returned to the economic mainstream in the form of raw materials or products.' " 215 Ill. 2d at 240, quoting 415 ILCS 5/3.380 (West 2002). I also agree with this further step. Further, there is no question that AFI "collected" and "processed" the plastic containers. So the *only* issue, on the merits, is whether the materials in question are "returned to the economic mainstream in the form of raw materials or products."

But having finally reached the bedrock question, the majority replaces analysis with assumption. The majority simply states as fact, with no analysis whatsoever, that by shredding the plastic containers and selling the shreds to Illinois Power to be burned for energy recovery, AFI is returning the materials to the economic mainstream as a "product." 215 Ill. 2d at 240. The majority does not spare a moment's reflection on whether plastic chips sold solely for combustive fuel ought to be characterized as "products" in the "economic mainstream." The conclusion is far from obvious to me. On rehearing the EPA strongly disputed this conclusion, noting that combustion of waste for energy recovery is not recycling. See 215 Ill. 2d at 241, quoting 415 ILCS 20/2.1 (West 2002). The EPA argues that if Illinois Power is not recycling when it *performs* the combustion of waste, neither can AFI be recycling when it processes what would otherwise be waste in order to make it more *suitable* for combustion and sells it to Illinois Power *for* combustion. (If the containers AFI is processing are "returned to the economic mainstream in the form of raw materials or products," then AFI *is* recycling, by the definition upon which the majority relies. See 415 ILCS 5/3.380 (West 2002).) This is a forceful and logical point, but the majority sidesteps it via the circuitous logic of stating that it is irrelevant, because the majority has *already concluded* (one page before) that the materials in question are not "waste."

In the original opinion, the majority did not analyze whether AFI was returning the materials to the economic mainstream as products because it mistakenly believed that the EPA did not dispute this fact. But now that the EPA has made it clear, on rehearing, that the majority was mistaken, and the EPA does indeed dispute this characterization of AFI's operations, some analysis must be undertaken. It is, after all, *the only issue in the case.*

It is worth recalling that this case comes before us on

appeal from a summary judgment in a declaratory judgment action. Because the factual characterization of the materials is at issue, it might be appropriate to take additional—that is, any—evidence, which would require reversal and remand. This highlights, in my mind, the impropriety of allowing AFI to bring this action in the first instance. Because the EPA has never even brought an enforcement action against AFI, the case is still in the investigatory stages. The EPA might not at this time have any evidence bearing on the question of whether the shredded plastic chips AFI sells to Illinois Power are "products," but since the EPA has never even brought formal charges against AFI, it can hardly be faulted for this state of affairs. It is like allowing a suspect to challenge the basis for his prosecution, when he has merely been brought in for questioning and asked not to leave town, and not even an indictment has yet been issued against him.

I still believe that this case—a challenge to a "violation notice," a mere precursor to a formal charging document—ought never to have been considered by an Illinois court, for the reasons set out in my original dissent and in this court's unanimous opinion in *National Marine*. I also believe, however, that if the case is to be taken, we must address the issues raised, rather than assuming them away. Finally, at the *very* least, we ought to have the issues fully briefed when a petition for rehearing raises serious points and a new member of the court is forced to participate in the case for the first time at the rehearing stage. Accordingly, I would vote to grant rehearing, and I respectfully dissent from the majority's conclusion to deny rehearing as modified.

JUSTICE KILBRIDE joins in this dissent on denial of rehearing.