SIXTH DIVISION
June 13, 2008

No. 1-07-2517

THE PEOPLE *ex rel*., LISA MADIGAN, Attorney General of the State of )
Illinois, )
           )
         Plaintiff-Appellee, )
           )
           v. )
           )
LINCOLN, LTD., an Illinois Corporation, and JOHN EINODER, an )
Individual, ) Appeal from
           ) the Circuit Court
         Defendants-Appellants ) of Cook County
           )
(The Village of Ford Heights, ) 04 CH 12782
           )
         Intervenor-Defendant-Appellant; ) Honorable
           ) Philip L.
Land of Lincoln Development Company, an Illinois Corporation Formerly ) Bronstein,
Known as Composting Corporation of America, an Illinois Corporation, ) Judge Presiding
Donald P. Clark, an Individual, Leslie E. Clark, an Individual, Donald A. )
Demorest, an Individual, Louis F. Cainkar, an Individual, Ruth F. Cainkar, )
an Individual, Standard Bank and Trust Company of Hickory Hills, as )
Trustee under Trust No. 1575, Unknown Owners as Beneficiaries Under )
Trust No. 1575, State Bank of Countryside, as Trustee under Trust No. )
91-1098, and Unknown Owners as beneficiaries under Trust No. 91-1098, )
           )
         Defendants). )

PRESIDING JUSTICE McBRIDE delivered the opinion of the court:

At the request of the Illinois Environmental Protection Agency, the Attorney General for

the State of Illinois filed an action for injunction and civil penalties against Lincoln, Ltd., and

Lincoln, Ltd.'s principal, John Einoder, for operating a "construction or demolition debris"

landfill in Ford Heights, Illinois, without a permit and in violation of  section 21(d)(2) of the

Illinois Environmental Protection Act (415 ILCS 5/21(d)(2) (West 2006) (Act)).  The People also

filed a motion for partial summary judgment as to whether the landfill operations violate the Act, and left open the issues of individual liability and penalties. The circuit court granted the motion. Lincoln, Ltd. and Einoder, collectively referred to as Lincoln, appeal on an interlocutory basis pursuant to Supreme Court Rule 308(a) (155 Ill. 2d R. 308(a)), arguing that the accumulated debris, which is mounded into a pile spanning over 26 acres and 70 feet in height, would be "waste" as defined by the Act but for the fact that the landfill is the proposed site of an all-seasons downhill skiing and snowboarding facility. Lincoln contends its plans for the site brings the waste within statutory exceptions for "clean construction or demolition debris" that is either "used as fill material *** [and] covered by a road or structure" or "separated or processed and returned to the economic mainstream in the form of raw materials or products." 415 ILCS 5/3.160(b) (West 2006). The Village of Ford Heights, an economically depressed community south of Chicago that has received $614,138 in dumping fees from the landfill operations (at a rate of $3 or $5 per semitruckload), was given leave to intervene in the proceedings and is a co-appellant. We granted the joint motion of the appellants to expedite the disposition of the appeal. See 155 Ill. 2d. R. 311. The owners of the real property were also named as defendants, however, they have not contested the People's allegations regarding violations at the landfill site and, based on a contract clause requiring the facility to comply with all laws, ordered Lincoln to shut down operations and then filed an arbitration action for indemnification.

The real property is a 40-acre parcel located east of Interstate 394/Bishop Ford Freeway (formerly known as the Calumet Expressway) and north of Lincoln Highway/U.S. Route 30, with a common address of 2061 East 14th Street, Ford Heights, Illinois, 60411.

2

On May 15, 2002, the Village of Ford Heights (the Village) and Lincoln's predecessor, Tri-State Industries (T-S), entered into a business license agreement indicating T-S "wishes to operate a sand, clay, dirt, gravel quarry and pit, recycling facility, and a construction and demolition debris landfill" and "proposes the end-use of the facility will be for public recreational use *** consisting of an outdoor recreation complex for snow skiiing, snowboarding, motor cross, and a walking/biking trail to operate upon the final contouring of the land that will be at least 150' above the highest elevation of the adjacent properties." The agreement entitled the Village to "$2.00 for each semi-tractor trailer truckload of material brought onto and deposited onto the site for either recycling or land filling." The mayor of the Village, Saul L. Beck, subsequently issued a proclamation "encourag[ing] all to contribute to the development" of a "worldclass outdoor recreation arena complex" by bringing clean construction and demolition materials to the landfill.

On July 2, 2002, the property owner entered into an eight-year royalty agreement with Lincoln which stated the owner wanted "to effect development and operation of a quarry, recycling facility, a clean construction or demolition landfill, and a winter recreational facility *** consistent with all federal, state and local laws and regulations, and current practices and technology, including conforming with the requirements of the Illinois Environmental Protection Act and the Surface-Mined Land Conservation and Reclamation Act." Further, Lincoln, the "Developer," had "the financial resources and technical expertise to engineer, develop, and operate the Facility contemplated." The specific facility contemplated by the parties was described in a site plan and development schedule which were not made part of the record on

appeal. However, the royalty agreement provided for the sharing of revenues received from material mined from the land, from "tipping fees for the disposal of general, clean, and construction or demolition debris," and from retail, food, and beverage sales. The agreement also gave Lincoln an option to expand from the 40 acres to "an additional 120 acres controlled by the Owner." A rudimentary drawing of the site that was created by an environmental engineering firm on August 1, 2002, depicts three ski or snowboard runs descending from a summit near the center of the property, a "warming house," and an automobile parking lot with 83 spaces.

In response to confidential complaints, the Illinois Environmental Protection Agency (EPA) began inspecting the site on August 15, 2002, for compliance with Illinois laws and regulations pertaining to the disposal, storage, and treatment of waste. The record suggests that when the landfill first began operating, materials were deposited into a hole or holes created when the site was a sand and gravel quarry, but that once the holes were filled with debris, defendants allowed debris to be mounded into a growing pile. More specifically, the agency's site inspections in August 2002 documented a mound 300 feet long by 90 feet wide by 8 feet high, and its inspections in October 2002 documented a mound 680 feet long by 315 feet wide by 47 feet tall. The agency's investigation lead to the issuance of a violation notice on October 3, 2002, and a series of negotiations between Lincoln, the owner, and the agency to effect compliance with the Act. The investigation also showed the landfill was accepting as many as 300 trucks per day. When compliance negotiations were unproductive, the agency referred the matter to the Attorney General for prosecution.

A "notice of intent" regarding the discharge of storm water was filed with the EPA by

Lincoln as "contractor." The form indicated the "approximate construction end date" for an "outdoor recreation arena/aggregate surface mine" would be July 1, 2020.

On July 6, 2004, the owner, Village, and developer agreed the Village's fee per truckload of debris brought onto the property would increase from $2 to $5.

The present suit was filed on August 6, 2004, when the debris mound was measured by the agency as 1780 feet long by 800 feet wide by 70 feet tall.

On August 16 and 26, 2004, the owner directed Lincoln to immediately cease all operations until the lawsuit could be resolved. When Lincoln refused to cease operations, the owner invoked the royalty agreement's dispute resolution clause, which Lincoln disregarded. In February 2005, the owner obtained a circuit court order to compel arbitration, and those arbitration proceedings are ongoing.

On October 15, 2004, the Village was given leave to intervene in the current litigation.

Lincoln stopped remitting royalty payments to the property owner after October 2006, and its last payment was for operations through February 2006.

During December 2006, Lincoln was contacted by representatives of All Season Extreme, a company based in La Grange, Illinois, that designs, develops, manages, and franchises extreme sports, recreation, and entertainment complexes. All Season Extreme is the exclusive distributor in the United States for Snow*flex*®, a synthetic surface material created and installed by Briton Engineering Developments, Ltd., for year-round downhill skiing and snowboarding. The president of All Season Extreme, Shawn Temple, stated in an affidavit dated June 8, 2007, that he considers the Ford Heights property to be "an ideal location for the construction of [an urban]

5

recreational facility using Snow*flex*® technology given its space, topography and its location within one mile of an interstate highway." He also stated in the affidavit or attached documents that his other company, LaGrange, LLC, would be willing to "provide a market and feasibility study on the landfill property," for a fee of $250,000, and that LaGrange, LLC, would be willing to "take the lead with its various partners to create a year round urban snow sports center on the landfill that will bring significant income to the interested parties," including tax revenue for Ford Heights. The "main feature of the [proposed market and feasibility] study" would be the use of Snow*flex*® and the report would include (1) Briton Engineering's "master plan documents, written narrative, program and programing material, thematic plans and highly produced drawings," (2) Baker Leisure Group's financial and operations evaluation including the development's estimated attendance, demographics, competition, operating hours, pricing strategy, etc., and (3) Huff & Huff's environmental review to "identify [environmental] permits [for construction], potential impacts and mitigation measures." Temple also stated that the anticipated construction costs of would be "substantially reduced by the fact that the hill itself is already in place" and that the "present condition of the property could realize roughly [$20 to $25] million in savings, [which he considered] a substantial incentive to prospective investors." Lincoln tendered Temple's affidavit and attached documents in opposition to the People's motion for partial summary judgment.

The circuit court's partial summary judgment ruling on August 14, 2007, in favor of the People resolved the parties' disagreement as to whether Lincoln's operations were contrary to the Act. The court also granted Lincoln's request for leave to file an interlocutory appeal pursuant

1-07-2517

to Supreme Court Rule 308 (155 Ill. 2d R. 308) and certified the following question for our review:

"Whether clean construction and demolition debris deposited onto the land for the purpose of providing the infrastructure for a recreational facility to be built at the site and to be used for snow skiing/snow boarding (facts which are undisputed for purposes of the August 4, 2007 partial summary judgment order) constitutes 'waste' under the Illinois Environmental Protection Act and requires a permit in compliance with the Act's waste disposal requirements including but not limited to 415 ILCS 5/3.305, 415 ILCS 5/21 *et seq.*, 415 ILCS 5/21.1 and 35 Ill. Adm. Code 812.101(a)."

Thus, reserving the right to dispute at trial Lincoln's version of the facts, the People agreed for purposes of the summary judgment proceedings that Lincoln's landfill contains only clean construction and demolition debris as defined in section 3.160(b) of the Act. 415 ILCS 5/3.160(b) (West 2006). Clean construction and demolition debris constitutes "waste" within the meaning of the Act, unless it comes within one of the exemptions created by the Illinois legislature. 415 ILCS 5/21(a) (West 2006). Furthermore, causing or allowing the open dumping of any waste or conducting any waste disposal operation without a permit granted by the agency is contrary to the Act. 415 ILCS 5/21(a), (d) (West 2006).

"(b) 'Clean construction or demolition debris' means

7

uncontaminated broken concrete without protruding metal bars, bricks, rock, stone, reclaimed asphalt pavement, or soil generated from construction or demolition activities.

Clean construction or demolition debris does not include uncontaminated soil generated during construction, remodeling, repair, and demolition of utilities, structures, and roads provided the uncontaminated soil is not commingled with any clean construction or demolition debris or other waste.

To the extent allowed by federal law, clean construction or demolition debris shall not be considered 'waste' if it is (i) used as fill material outside of a setback zone if the fill is placed no higher than the highest point of elevation existing prior to the filling immediately adjacent to the fill area, and if covered by sufficient uncontaminated soil to support vegetation within 30 days of the completion of filling or if covered by a road or structure, or (ii) separated or processed and returned to the economic mainstream in the form of raw materials or products, if it is not speculatively accumulated and, if used as a fill material, it is used in accordance with item (i) ***." 415 ILCS 5/3.160 (West 2006).

The policy underlying summary judgment proceedings is to facilitate litigation, avoid unnecessary trials, and reduce congestion on the court's calendar. *Brown v. Murphy*, 278 Ill.

8

App. 3d 981, 989, 664 N.E.2d 186, 192 (1996). When the pleadings, depositions, admissions, and affidavits on file, viewed in the light most favorable to the nonmoving party, show that there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law, the entry of summary judgment is appropriate. *Kajima Construction Services v. St. Paul Fire & Marine Insurance Co.*, 227 Ill. 2d 102, 105, 879 N.E.2d 305, 308 (2007). The court does not decide factual issues and instead determines whether any exist. *Brown*, 278 Ill. App. 3d at 989, 664 N.E.2d at 192. Summary judgment should be granted only when the right of the moving party is clear and free from doubt. *Brown*, 278 Ill. App. 3d at 989, 664 N.E.2d at 192. An appellate court addresses the issues *de novo*, without any deference to the trial court's findings. *Brown*, 278 Ill. App. 3d at 989, 664 N.E.2d at 192.

Lincoln's primary argument on appeal concerns the second of the two statutory exemptions quoted above. Lincoln contends the landfill does not contain "waste" within the meaning of the Act because by depositing debris at the Ford Heights property as the foundation for an all-seasons snowsports facility, Lincoln is "reus[ing] [the debris] as part of an ongoing economic development activity." At appellate arguments, Lincoln emphasized it considers the construction to be underway rather than a plan to be implemented in the future, because Lincoln already has a business license from the Village of Ford Heights and the local distributor of Snow*flex*® synthetic ski surface has sworn the debris mound puts the project $20 to $25 million "ahead." Lincoln cites *Alternate Fuels, Inc. v. Director of the Illinois Department of Environmental Protection Agency*, 215 Ill. 2d 219, 830 N.E.2d 444 (2005), for the proposition that "the question in this case is not what the generator of the *** debris originally intended for

those materials, but rather how the materials in question are being used and/or reused at the subject site in Ford Heights." Lincoln contends a waste permit is unnecessary because its "reuse" triggers the exemption set out in section 3.160(b) of the Act for debris "(ii) separated or processed and returned to the economic mainstream in the form of raw materials or products, if it is not speculatively accumulated and, if used as a fill material, it is used in accordance with item (i)." 415 ILCS 5/3.160(b) (West 2006).

The People respond that Lincoln's operations satisfy none of the statute's criteria and that Lincoln is permanently landfilling waste without the necessary permit. See 415 ILCS 5/21(a), (d) (West 2006) (indicating clean construction or demolition debris is waste unless it qualifies for a statutory exemption, and causing or allowing open dumping of waste violates the Act). Further, accepting Lincoln's interpretation of the statutory exception would severely undermine landfill regulation, as any operator who claimed a future plan for an exhausted landfill site could avoid regulatory oversight during the years or decades of landfill operations.

The fundamental rule of statutory construction is to ascertain and give effect to the intention of the legislature. *Alternate Fuels*, 215 Ill. 2d at 237-38, 830 N.E.2d at 454. "The language of the statute is the most reliable indicator of the legislature's objectives in enacting a particular law." *Alternate Fuels*, 215 Ill. 2d at 238, 830 N.E.2d at 455. The words used by the legislature are to be given their plain and ordinary meaning (*Alternate Fuels*, 215 Il. 2d at 238, 830 N.E.2d at 445), all provisions of an enactment are to be viewed a whole, and words and phrases must be construed in light of relevant provisions of the statute rather than in isolation. *Raintree Homes, Inc. v. Village of Long Grove*, 209 Ill. 2d 248, 256, 807 N.E.2d 439, 444 (2004).

Each word, clause or sentence must be given reasonable meaning and should not be deemed superfluous or void. *Raintree Homes*, 209 Ill. 2d at 256, 807 N.E.2d at 444.

There is no indication in the record that Lincoln's activities satisfy the "separated or processed" clause of the statute it is relying upon. Neither word requires express definition by the legislature. The commonly understood meaning of "separate" is "to sort, part, divide or disperse *** as into individual units, components, or elements" or "to take by parting or dividing; extract (usually fol[lowed] by *from* or *out*)" (Random House Webster's Unabridged Dictionary 1746 (2nd ed. 1998)), and the commonly understood meaning of "process" is "a systematic series of actions directed to some end" or "a continuous action, operation or series of changes taking place in a definite manner" (Random House Webster's Unabridged Dictionary 1542 (2nd ed. 1998)). See *e.g.*, *Stein v. Chicago Park District*, 323 Ill. App. 3d 574, 752 N.E.2d 631 (2001) (using a dictionary to ascertain the common meaning of statutory language). Thus, the legislature clearly required Lincoln to transform the waste brought to the Ford Heights landfill by either sorting and extracting out the useable components or by performing some action that changes the material received into a more desirable form. No separating or processing has taken place at the Ford Heights landfill. The record on appeal indicates Lincoln visually inspected debris as it was brought onto the property and again after each truckload was tipped onto the site, to ensure that the contents were in fact "clean construction or demolition debris." 415 ILCS 5/3.160(b) (West 2006). Lincoln may also have periodically compressed the waste pile in order to get rid of air pockets and make the hill more stable. Lincoln did not, however, sort through and separate out any type of useable material, or process the waste in some way such as

11

by washing or chipping it for any subsequent reuse. When asked at appellate arguments about this requirement, Lincoln stated the People have never disputed that the landfill operations satisfy the "separated or processed" clause of section 3.160(b). 415 ILCS 5/3.160(b) (West 2006). This is incorrect, though, because the argument appears in both the People's motion for partial summary judgment and the People's appellate brief. Moreover, regardless of what the People may have emphasized in its written or oral arguments, all of the statutory language must be given effect and no terms can be treated as superfluous. *Raintree Homes*, 209 Ill. 2d at 256, 807 N.E.2d at 444. Lincoln also argued to this court that heaping the waste into a hill is enough to come within the statutory meaning of "separated or processed." 415 ILCS 5/3.160(b) (West 2006). We do not find this persuasive because Lincoln's customers, not Lincoln, heaped the waste into a towering pile, Lincoln has taken no further action other than to remove air pockets from the mound, and pushing or shifting the waste around the 40-acre site has not altered the material itself. For these reasons, we conclude Lincoln's activities did not bring the discarded waste within the terms of section 3.160. 415 ILCS 5/3.160(b) (West 2006).

Furthermore, Lincoln fails to persuade us it has satisfied the legislature's additional requirement to "return[] [the debris] to the economic mainstream in the form of raw materials or products." Lincoln has taken material from the stream of commerce, by accepting truckloads of debris from contractors and others who must dispose of material, but Lincoln is not returning the material to the stream of commerce when it permanently keeps the material on site for its own use. Lincoln suggested at appellate arguments that an economic benefit has been derived because Lincoln has paid truckload tipping fees to the Village of Ford Heights, because the president of

All Seasons Extreme, the local sales agent for the synthetic sports surface Snow*flex*®, considers the waste pile to be a $20 to $25 million contribution toward the construction costs of a year-round recreation facility, and because the completed facility will some day benefit the local economy. However, the statute mandates more than the accrual of some economic benefit to the local government and unfounded speculation about what may intrigue potential investors and potential customers in the future. Paying a small tax to the local government, speculating about the costs of converting today's landfill into a desirable end use, and making a prediction about consumer interest in a potential recreation facility is not the same as putting extracted raw materials or new products into the economic mainstream today.

In contrast, in the case Lincoln relies upon, *Alternate Fuels*, a company was receiving empty plastic agricultural pesticide containers which had been triple washed to remove residual chemicals, chipping the containers, and selling the one-inch chips to the local electric company to burn as fuel. *Alternate Fuels*, 215 Ill. 2d at 241, 830 N.E.2d at 456. The company also agreed to sell to the power company a combination of clean plastic chips and scrap wood to use as fuel. *Alternate Fuels*, 215 Ill. 2d at 225, 830 N.E.2d at 447. The company's sorting, chipping, and mixing operations were in East St. Louis, Illinois. *Alternate Fuels*, 215 Ill. 2d at 222, 830 N.E.2d at 446. The power company's incinerator was in Baldwin, Illinois. *Alternate Fuel*s, 215 Ill. 2d at 222, 830 N.E.2d at 446. Although the case involved a different statute than the one at issue here, the operative language was similar in that the materials could be deemed " 'discarded' " or " 'collected, separated or processed and returned to the economic mainstream in the form of raw materials or products.' " *Alternate Fuels*, 215 Ill. 2d at 240, 830 N.E.2d at

13

456, quoting 415 ILCS 5/3.380 (West 2002). The court agreed the materials were not "discarded" because the East St. Louis company "processes the plastic containers and returns them as a 'product' into the economic mainstream, as demonstrated by the contract with [the electric company's Baldwin Power Station]." *Alternate Fuels*, 215 Ill. 2d at 240, 830 N.E.2d at 456. The East St. Louis operations came within the exception because the plastic containers, which would otherwise be landfill material, had been transformed into a useable form, sold, transported offsite, and used offsite by an unrelated third party. The *Alternate Fuels* scenario is not analogous to Lincoln permanently retaining unaltered debris onsite for its own eventual use. *Alternate Fuels*, 215 Ill. 2d 219, 830 N.E.2d 444. Lincoln's activities do not include a commercial transaction with a third party concerning a newly created raw material or product. Hoarding material indefinitely is not the same as returning raw materials or products to the mainstream of commerce. In our opinion, *Alternate Fuels* demonstrates the fallacy of Lincoln's position. *Alternate Fuels*, 215 Ill. 2d 219, 830 N.E.2d 444.

For this additional reason, we conclude Lincoln has not shown its Ford Heights landfill operations come within the second exception set out in section 3.160(b) of the Act. 415 ILCS 5/3.160(b) (West 2006). As the People point out, accepting Lincoln's claim would negate landfill regulation by allowing any landfill operator with future intention for a site to avoid meaningful regulatory oversight. At this point in time, Lincoln has no more than a future idea about the end use of the Ford Heights landfill and an offer from the local distributor of a synthetic snow material to study, for a $250,000 fee, whether an all-season recreation facility at that location would be commercially viable. Accordingly, Lincoln may not claim benefit of the

legislature's exception for clean construction or demolition debris that has been "separated or processed and returned to the economic mainstream in the form of raw materials or products." 415 ILCS 5/3.160(b) (West 2006).

Next, Lincoln states the Ford Heights landfill does not contain "waste" within the meaning of the Act, because section 3.160(b) also provides an exception for all clean construction and demolition debris that is covered by a road or structure, and Lincoln intends to cover the collected debris with a recreation facility. 415 ILCS 5/3.160(b) (West 2006). Lincoln merely states this proposition and makes no attempt to support it with analysis or authority. Mere contentions, however, are not enough. This court will not take on the appellants' tasks of research and reasoning. See 210 Ill. 2d R. 341(h)(7) (formerly known as Rule 341(e)(7), the rule requires an appellant's opening brief to contain contentions, reasoning, and citation to supporting authority and pages of the record). Instead, we find the contention has been waived. *Village of Riverwoods v. BG Ltd. Partnership*, 276 Ill. App. 3d 720, 729, 658 N.E.2d 1261, 1268 (1995) (finding waiver where appellant failed to cite supporting authority). Furthermore, the People point out Lincoln has disregarded statutory language it does not like -- the exemption applies only when clean construction or demolition debris used as fill material is placed no higher than the adjacent land, but the subject waste pile undisputably towers more than 70 feet over the adjacent land. Thus, Lincoln's alternate contention on appeal is not convincing.

The accumulated clean construction or demolition debris at issue is waste unless Lincoln shows it comes within a statutory exception, and Lincoln has not made this showing. Lincoln's unpermitted waste pile violates the Act. We therefore answer the certified question in the

1-07-2517

affirmative and remand the cause to the circuit court for further proceedings.

Certified question answered; cause remanded.

J. GORDON and O'MALLEY, JJ., concur.