2026 IL App (2d) 250024
No. 2-25-0024
Opinion filed January 29, 2026

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE SOLID WASTE AGENCY OF LAKE COUNTY and THE COUNTY OF LAKE, ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | No. 22-MR-423 |
| | ) | |
| ZION LANDFILL, INC., | ) ) | Honorable Charles W. Smith, |
| Defendant-Appellee, | ) | Judge, Presiding. |

JUSTICE MULLEN delivered the judgment of the court, with opinion.
Justices Hutchinson and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1                               I. INTRODUCTION

¶ 2     Plaintiffs, the Solid Waste Agency of Lake County (SWALCO) and Lake County, appeal

the judgment of the circuit court of Lake County finding that defendant, Zion Landfill, Inc., was

exempt from paying fees on certain material brought into the landfill (tipping fees). This appeal

presents two primary issues. First, the parties disagree on whether materials used by defendant to

cover waste and to construct internal roadways are subject to the tipping fee. Second, the parties

dispute whether material certified as "non-special" by the generator of the material—meaning it is

no longer subject to additional handling and record-keeping requirements—is still "pollution control waste," which is exempt from the tipping fee. For the reasons that follow, we affirm.

¶ 3                                    II. BACKGROUND

¶ 4      Defendant operates a landfill in Lake County. SWALCO is an intergovernmental agency formed by agreement in accordance with the Local Solid Waste Disposal Act (415 ILCS 10/1 *et seq.* (West 2022)). Lake County is a member of SWALCO. Defendant's landfill falls within the territorial jurisdiction of plaintiffs. James Lewis began working for defendant in 1995 and was the general manager of the landfill from 2000 until 2020. Walter Willis has been the executive director of SWALCO since 2007.

¶ 5      Defendant's landfill accepts material from various sources. Generally, tipping fees are payable to the Illinois Environmental Protection Agency (IEPA) on waste taken into the landfill. Local government, such as SWALCO, is also authorized to impose similar fees on such waste. There are several statutory exemptions to these fees. In this case, defendant uses wood chips to cover waste (alternate daily cover) and to construct roads within and around its landfill (road base). The wood chips must meet certain size specifications, and, in most cases, defendant either purchases them or pays a fee for their delivery to the site. Defendant also uses what it terms "recycled" aggregate materials—including asphalt, crushed concrete, and bricks—as road base. The issue presented is whether these materials are "waste" that is subject to a tipping fee payable to SWALCO. The IEPA is not a party to this case.

¶ 6      Before proceeding further, it would be helpful to explain the statutory and administrative framework controlling the issues before us. Section 3.535 of the Environmental Protection Act (Act) (415 ILCS 5/3.535 (West 2022)) defines "waste," in pertinent part, as "garbage *** or other discarded material." Section 22.15(b)(1) of the Act requires owners of landfills that accept more

than 150,000 cubic yards of waste per year, like defendant, to pay to the state's Solid Waste Management Fund a fee of $2 per ton of waste they take in. *Id.* § 22.15(b)(1). Section 22.15(j) allows units of local government to adopt ordinances imposing fees on waste that mirror the state fee. *Id.* § 22.15(j). Plaintiffs adopted such ordinances.

¶ 7    Section 22.15(k) exempts a number of categories of waste from these fees, including "pollution control waste." *Id.* § 22.15(k); see *id.* § 22.44(c)(2). The Act defines "pollution control waste" as

> "waste generated as a direct or indirect result of the removal of contaminants from the air, water or land, and which pose a present or potential threat to human health or to the environment or with inherent properties which make the disposal of such waste in a landfill difficult to manage by normal means." *Id.* § 3.335.

Section 3.475(c) states that "pollution control waste" is a subcategory of "special waste." *Id.* § 3.475(c). Special waste is subject to more stringent handling and record-keeping requirements. See 35 Ill. Adm. Code 809.Subpart D; see also 35 Ill. Adm. Code 811.Subpart D. The responsibility of classifying waste falls on the generator of the waste. See 35 Ill. Adm. Code 808.121(a) (2010) ("Each person who generates waste shall determine whether the waste is a special waste."). Section 3.475(c)(1) exempts certain types of material that would otherwise be "pollution control waste" from the category of "special waste." 415 ILCS 5/3.475(c)(1) (West 2022). Specifically, where the generator of the waste certifies that it does not fall within any of five categories set forth in section 3.475(c)(1), the material is not considered "special waste." *Id.* § 22.48(a). If such a certification is made, the material need not be managed as special waste. *Id.* Also potentially relevant here is section 22.54 of the Act, which allows a material normally required to be treated as waste to be

managed as non-waste if it is "used beneficially and in a manner that is protective of human health and the environment." *Id.* § 22.54 (providing for a "Beneficial Use Determination[ ]").

¶ 8    Also relevant to the issues we face, "alternate daily cover" is material used to cover exposed waste at the end of a business day. The permit under which defendant operates states that "[a]t the end of each day of operation all exposed waste shall be covered with" at least six inches of clean soil or various specified alternative materials (alternate daily cover). The list of acceptable alternate materials includes petroleum-contaminated soils, wood chips, used foundry sand, processed landscape waste, and clean construction and demolition debris. The permit further provides that "[a]reas upon which alternate cover has been used must be covered with either conventional cover or additional waste within six days." Further, runoff from the alternate daily cover must be collected as "leachate," which is defined as liquid that has been in contact with "waste." The permit establishes additional requirements for the use of various materials.

¶ 9    Thus, we are presented with the following two questions. First, we must decide whether alternate daily cover and road base constitute "other discarded material" such that they fall within the statutory definition of "waste" and thus are subject to the Solid Waste Management Fund fee. Second, we must decide whether waste certified by its generator as "non-special" loses its status as pollution control waste such that it is no longer exempt from the fee.

¶ 10    Both parties muster extrinsic evidence in support of their interpretations. Plaintiffs point to a letter from Douglas W. Clay of the IEPA dated April 1, 2009, and a letter from Scott O. Phillips of the IEPA dated August 12, 2010.

¶ 11    The Clay letter begins by explaining that it is a response to a query by three individuals representing three local agencies, including Willis of SWALCO. It adds that it is addressing the question of whether "certain types of waste" are exempt from the fees imposed by sections 22.15

and 22.44 if "they are used as alternate daily cover, intermediate cover and/or road building material." It then states:

"As a general rule, use of a waste at a landfill as daily cover, intermediate cover, or roadbed material does not make the waste exempt from the tipping fees imposed by Sections 22.15(b), 22.12(j) and 22.44(b) of the Act. There is, however, an exception to this rule: clean construction and demolition debris that is used in accordance with Section 3.160(b) of the Act is not a waste and therefore not subject to the tipping fees."

The letter answers several other questions. Pertinent here, it states "No" when asked, "Are wastes that are used for Alternate Daily Cover Material [alternate daily cover] exempt from the fees solely because they are used as [alternate daily cover]?" It also responds negatively to "Are alternate intermediate cover materials or road building materials which are waste (*i.e.* general construction or demolition debris, shredded tires or shredded uncontaminated wood) exempt from fees even if they are ultimately disposed of at the landfill after their use?" Additionally, using waste as alternate daily cover is not "considered recycling, reclamation or reuse." Whether a landfill charges a tipping fee, takes the material for free, or pays for the material has no bearing on any of these issues.

¶ 12     The Phillips letter states that its purpose is to clarify which materials received by a landfill are subject to fees under sections 22.15 and 22.44 of the Act. It notes that these sections "impose State solid waste tipping fees upon non-hazardous waste that is permanently disposed at a landfill" and that "[s]uch waste includes, but is not limited to, non-hazardous waste disposed at a landfill via its use as daily cover or roadbed material as approved in the landfill's permit." It notes that certain material is exempt from such fees, including pollution control waste. It further recognizes that materials for which there has been a beneficial use determination are not waste and therefore not subject to the fee and adds that such material "includes, but is not limited to, material used at

a landfill as daily cover or roadbed material pursuant to a beneficial use determination" so long as the use is provided for in the landfill's operating permit.

¶ 13    Extrinsic evidence that supports defendant's position exists as well, specifically: the deposition testimony and affidavit of James Lewis regarding a conversation he had with an IEPA employee (Jan Zanitella); a letter from Michael F. Nechvatal of the IEPA dated January 6, 2004; and a second letter from Nechvatal dated January 25, 2005. Defendant also points to the legislature's failure to enact legislation proposed by SWALCO in 2012 and the IEPA's discontinuance of an enforcement action against defendant in 2020.

¶ 14    At his deposition, Lewis, who had been defendant's general manager since 2000 and its employee since 1995, testified regarding a conversation he had with Zanitella. Lewis explained that Zanitella was the "state auditor, the fee auditor." In the late 1990s, she told him not to include material used as alternate daily cover as waste on quarterly reports. Lewis believed that this guidance had been put in writing, though he had been unable to locate such a document.

¶ 15    In January 2004, Nechvatal authored a letter (the Nechvatal letter) directed to Rose Wagehoft of Brickyard Disposal & Recycling in Vermilion County. He stated that the letter was a response to her inquiry regarding "whether contaminated soil that is used as an alternate daily cover material is subject to the solid waste tipping fees described in Sections 22.15 and 22.44 of the Illinois Environmental Protection Act." He explained that contaminated soil that "meets the Act's definition of 'pollution control waste' " is "exempt from the tipping fees pursuant to Sections 22.15(k)(2) and 22.44(c)(2) of the Act, regardless of whether it is used as daily cover." He clarified, "The pollution control waste exemption applies even if the contaminated soil is certified by the generator not to be a special waste; the certified waste is still pollution control waste." Further, he noted, "Uncontaminated soil is not a waste and is also not subject to the tipping fees." In response

to a series of questions from Waste Management, Nechvatal authored a second letter (the second Nechvatal letter) clarifying a few points. Pertinent here, he explained that all pollution control waste, not just contaminated soil, is exempt from the tipping fee regardless of whether the generator certifies it as non-special waste. He also stated, when asked for the effective date for landfills to begin applying the fee exemption, that "[d]eciding when and how to apply the tipping fee exemption is a business decision that landfill operators will have to make."

¶ 16    In 2012, SWALCO supported passage of a bill that would amend sections 22.15 and 22.44 to remove pollution control waste from the specified materials to which the fee exemption applied. The amendments were not adopted. In an e-mail dated July 23, 2020, Willis explained to two legislators that "SWALCO, frustrated with IEPA's response to enforcing its 2009 letter, attempted to pass legislation to get rid of all the exemptions in the Act" but "[t]he waste industry was able to stop us." It additionally noted, "We also had very little if any support from the [IEPA] on the bill."

¶ 17    On December 19, 2019, the IEPA issued a violation notice to defendant and a number of other landfills. The notice sent to defendant alleged two violations. First, it asserted that defendant failed to pay tipping fees on 114,498 tons of waste in the amount of $254,185.56 for material used as alternate daily cover and road base between January 1, 2016, and December 31, 2018. Second, it alleged that defendant failed to maintain adequate records related to the tipping fee exemption.

¶ 18    Defendant provided a formal response to the notice on May 4, 2020. In its response, defendant asserted that "waste" and "cover" are "distinct materials treated differently under the [Act]." "Waste" is discarded material that serves no beneficial purpose. Conversely, "cover" is defined by regulation as "material that is used to cover compacted solid waste in a sanitary landfill and that is free of objects that would hinder compaction and free of content that would be conducive to vector harborage, feeding or breeding." 35 Ill. Adm. Code 807.104 (1985). "Cover,"

as used in the waste industry, "serves as a protective barrier between 'waste' and the environment." Defendant further argued that imposing fees in the manner advocated by the IEPA would constitute a new rule requiring adherence to the rulemaking procedure, which had not been followed. Where the rulemaking procedure has not been followed, the rule at issue is deemed "interpretive" and cannot provide the basis for a penalty. Defendant further contended that the material it used for road base was not "waste." It explained that it primarily used two materials for road base—wood chips and recycled asphalt (it uses smaller amounts of concrete and bricks as well). The wood chips are processed before defendant uses them. Wood chips, according to defendant, are "products used for building roads, not discarded waste materials that serve no beneficial purpose." Finally, defendant asserted that its record keeping was adequate.

¶ 19    Following a meeting between defendant and the IEPA, defendant offered a second response. It stated, "We understand that the Agency, through the Violation Notice, is not seeking to expand the category of materials subject to the waste fee or to change its positions on either the application of the Section 22.15(k) exemptions or the distinction between a waste and a product." It further stated:

> "The Zion VN does not concern contaminated soil. To confirm, contaminated soil is not subject to the fee because it is used as alternative daily cover and because it constitutes pollution control waste and hence is exempt from the waste fee under 415 ILCS 22.15(3). Wood chips used as road base materials are not subject to the waste fee because they are specially manufactured products and because they are authorized for use as road materials in the facility's permit."

It also asserted that defendant has not changed the way it has kept records for 22 years; however, defendant also proposed altering its record keeping to address the IEPA's concerns.

¶ 20     On July 10, 2020, the IEPA rescinded its violation notices. In a letter to defendant, it wrote:

"The Illinois EPA has received and reviewed your correspondence related to the above-referenced Violation Notices ('the VNs'). In light of the information provided in your correspondence and other information received to date, no further action in response to the VNs is necessary at this time."

In his e-mail of July 23, 2020, Willis, stated that he had received a telephone call from an IEPA representative stating that the IEPA "had questions about the strength of the case and that the agency was instead going to start talks with the waste industry and put on hold the court filings."

¶ 21     Plaintiffs filed the instant declaratory-judgment action on August 30, 2022. The parties filed cross-motions for summary judgment. In a written ruling, the trial court granted defendant's and denied plaintiffs' motion. It found that as the parties filed cross-motions for summary judgment, they agreed that no issue of fact existed and were "invit[ing] the court to decide the issues based on the record." *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. The central issue, according to the trial court, was whether the materials at issue constitute "waste." Plaintiffs asserted that the materials are "waste" because they have no further useful life, will remain in the landfill forever, and cannot return to the chain of commerce. Defendant contended that the materials are not waste because defendant uses them for alternate daily cover and road base. The trial court also rejected, as contrary to the plain language of the Act, plaintiffs' contention that classifying pollution control waste as non-special waste renders the fee exemption inapplicable. It finally found that "the term waste does not include wood chips and road debris which is used in the construction of roads within the landfill, or which is used for alternate daily cover." Further, pollution control waste is exempt from the fee.

¶ 22    In the course of its ruling, the trial court also noted that both parties could point to communications from the IEPA in support of their positions. It then observed that despite the opinion expressed in the Clay letter, the IEPA never sought to recover the tipping fees until it issued the notice of violation in 2019 and that it abandoned that attempt after reviewing defendant's response. The trial court explained:

> "The IEPA has been confronted with this issue many times over the past two decades and has only once, in 2019, commenced an enforcement action only to retreat from that position. This is a clear indication to this court that the Agency charged with enforcement of environmental statutes does not consider the material at issue in this case to be 'waste' and that the Defendant's position is correct that the material is being recycled and used as Alternative Daily Cover and, thus, exempt from the fees sought by the Plaintiffs."

Plaintiffs now appeal.

¶ 23                                III. ANALYSIS

¶ 24    On appeal, plaintiffs raise two main issues. First, they contend that materials used by defendant as alternate daily cover and road base are "waste" within the meaning of the Act and that tipping fees are due on it. Second, they contend that pollution control waste that has been certified as non-special by its generator is not exempt from tipping fees. Defendant also interposes two affirmative defenses, estoppel and laches; however, given our disposition of this appeal, we need not address them.

¶ 25    Because this appeal comes to us following a grant of summary judgment, our review is *de novo*. A court reviewing a grant of summary judgment, construing the record strictly against the movant and in favor of the party opposing summary judgment, must determine whether no genuine

issue of material fact exists and the movant is entitled to judgment as a matter of law. *Monson v. City of Danville*, 2018 IL 122486, ¶ 12.

¶ 26     Both issues raised by plaintiffs turn on the interpretation of various sections of the Act. Our goal in interpreting a statute is to ascertain and give effect to the intention of the legislature. *Gallagher v. Union Square Condominium Homeowner's Ass'n*, 397 Ill. App. 3d 1037, 1041 (2010). The best indicator of that intent is the language of the statute itself. *Abruzzo v. City of Park Ridge*, 231 Ill. 2d 324, 332 (2008). If a statute is clear and unambiguous, a court must give effect to its plain language, without resorting to other aids of construction. *Hobby Lobby Stores, Inc. v. Sommerville*, 2021 IL App (2d) 190362, ¶ 20. In determining the intent of the legislature, a court must consider "statutes in their entirety, their purposes, the problems they target, and the goals they seek to achieve." *Abruzzo*, 231 Ill. 2d at 332. Furthermore, "Words and phrases should not be interpreted in isolation, but must be construed in light of other relevant provisions of the statute." *Id.* at 333. While we are not bound by an administrative agency's interpretation of a statute, a court "will give substantial weight and deference to an interpretation of an ambiguous statute by the agency charged with the administration and enforcement of the statute." *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 97-98 (1992).

¶ 27                    A. Is Alternate Daily Cover and Road Base "Waste"?

¶ 28     "It is an old saying that one person's trash is another one's treasure." Allegra Helfenstein, Comment, *U.S. Controls on International Disposal of Hazardous Waste*, 22 Int'l Law. 775, 775 (1988). In this case, trash would mean revenue for the taxing body. Section 22.15(b)(1) of the Act requires the owner of a landfill to pay a fee on each ton of "waste" it takes in. 415 ILCS 5/22.15(b)(1) (West 2022). The parties disagree as to whether materials used by defendant as alternate daily cover and road base are "waste" and therefore subject to tipping fees. Plaintiffs

contend that the plain meaning of the term "waste" as used in the Act indicates that materials deposited permanently in a landfill constitute "waste." Defendant counters by pointing to the plain language of the Act, as well as to extrinsic evidence (various IEPA interpretations and conduct that support defendant's position), without first demonstrating that there is some ambiguity in the statutory scheme that requires the resort to such evidence.

¶ 29    As a threshold matter, we must determine whether some ambiguity pertinent to the issues in this case exists. We begin with the statutory definition of "waste":

> " 'Waste' means any garbage, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility *or other discarded material*, including solid, liquid, semi-solid, or contained gaseous material resulting from industrial, commercial, mining and agricultural operations, and from community activities, but does not include solid or dissolved material in domestic sewage, or solid or dissolved materials in irrigation return flows, or coal combustion by-products as defined in Section 3.135, or industrial discharges which are point sources subject to permits under Section 402 of the Federal Water Pollution Control Act, as now or hereafter amended, or source, special nuclear, or by-product materials as defined by the Atomic Energy Act of 1954, as amended (68 Stat. 921) or any solid or dissolved material from any facility subject to the Federal Surface Mining Control and Reclamation Act of 1977 (P.L. 95-87) or the rules and regulations thereunder or any law or rule or regulation adopted by the State of Illinois pursuant thereto." (Emphasis added.) *Id.* § 3.535.

The parties do not argue that the materials at issue here are "garbage" or any of the other items specifically listed in section 3.535; therefore, we must ascertain the meaning of the catch-all provision, "other discarded material." To constitute "waste," the material used by defendant must

be "other discarded material." Thus, to determine whether "waste" is ambiguous, we must consider whether "other discarded material" is ambiguous.

¶ 30      Two cases discussed by the parties are pertinent to our inquiry, neither of which held "other discarded material" to be ambiguous: *Alternate Fuels, Inc. v. Director of the Illinois Environmental Protection Agency*, 215 Ill. 2d 219 (2004), and *People ex rel. Madigan v. Lincoln, Ltd.*, 383 Ill. App. 3d 198 (2008). In *Alternate Fuels*, the issue relevant to this case was whether material produced by Alternate Fuels, Inc. (AFI), constituted "waste" under the Act, such that AFI was required to obtain a permit from the IEPA (Agency). *Alternate Fuels*, 215 Ill. 2d at 222. The material "consisted of various types of plastics generated by the shredding of empty agricultural chemical containers into chips approximately one inch in size." *Id.* "Prior to shredding, a company named Tri-Rinse, Inc., 'triple rinsed' the containers according to United States Environmental Protection Agency and Department of Agriculture guidelines to remove residual agricultural chemicals." *Id.* AFI would sell the "chips to Illinois Power for use as fuel at its Baldwin Power Station." *Id.* The Agency asserted that "all materials burned for energy recovery retained their classification as waste under the Act and that a facility receiving this material would require a permit from the Agency." *Id.* The trial court determined that the materials in question had not been "discarded" so they were not "waste."

¶ 31      On appeal, the supreme court considered the definition of "discarded material." *Id.* at 237. The Agency maintained "that the term 'discarded' should be construed from the perspective of the supplier, such that a material is considered discarded if it is used for a purpose other than that originally intended by the generator of the material." *Id.* AFI argued that "when the phrase 'discarded material' is read in conjunction with section 3.380 of the Act (415 ILCS 5/3.380 (West 2002))," it is apparent that the material at issue is not "discarded" and therefore not "waste." *Id.*

¶ 32    The supreme court first noted that the definition of "waste" as "other discarded material" focuses on the material itself without regard to who purportedly discarded the material. (Emphasis and internal quotation marks omitted.) *Id.* at 239. It therefore rejected the Agency's assertion that "discarded" should be assessed from the perspective of the generator of the material. *Id.* Having previously invoked the principle that "words and phrases should not be construed in isolation, but must be interpreted in light of other relevant provisions of the statute" (*id.* at 238), the court turned to section 3.380, upon which AFI was relying, for guidance regarding the meaning of "discarded":

> " ' "Recycling, reclamation or reuse" means a method, technique, or process designed to remove any contaminant from waste so as to render such waste reusable, or any process by which materials that would otherwise be disposed of or discarded are collected, separated or processed and returned to the economic mainstream in the form of raw materials or products.' " (Emphasis omitted.) *Id.* at 239 (quoting 415 ILCS 5/3.380 (West 2002)).

It noted:

> "Under this phrasing the legislature has categorized items that may be recycled, reclaimed, or reused into two main categories: (1) 'waste' from which contaminants may be removed and (2) 'materials.' 415 ILCS 5/3.380 (West 2002). 'Materials' are further subdivided into those that are 'discarded' and those 'materials that would otherwise be disposed of or discarded [which] are collected, separated or processed and returned to the economic mainstream in the form of raw materials or products.' 415 ILCS 5/3.380 (West 2002). While the legislature has not defined 'discarded materials,' the legislature has mentioned what it is not: 'materials that would otherwise be disposed of or discarded [which] are *** returned to the economic mainstream in the form of raw materials and

products.' Thus, materials are 'discarded' unless they are returned to the economic mainstream." *Id.* at 240.

The final sentence of this quote, read in isolation, suggests that the supreme court held that all material that has not been returned to the economic mainstream is discarded material. In context, it is apparent that the final sentence was a reference to the facts of that case in light of AFI's argument that section 3.380's definition of "discarded" informed the interpretation of what the term meant in the statutory definition of "waste." That is, under section 3.380, the only way the plastic containers at issue in *Alternate Fuels* could have been deemed waste is if they had not been returned to the economic mainstream.

¶ 33    The penultimate sentence in the quotation explains that the legislature has specified that "discarded materials" are not materials that are "returned to the economic mainstream." It does not follow that all materials not returned to the economic mainstream are discarded. From the proposition, "all cats are not dogs," one can infer that "if it is a dog, then it is not a cat"; however, it does not follow that "if it is not a dog, then it is a cat." Similarly, something that has been returned to the economic mainstream has not been discarded, but saying something has not been returned to the mainstream encompasses the possibility that it has been discarded as well as a myriad of other possibilities. For example, the cloth saved for mending has little prospect of being returned to the economic mainstream in any meaningful way, yet it cannot be said to be "discarded" in any usual sense of the word. Therefore, we read the final sentence in the quotation from *Alternate Fuels* set forth above as a response to AFI's argument concerning section 3.380 and not as a general pronouncement that only those materials that have been returned to the economic mainstream are not discarded. Put differently, being returned to the economic mainstream is a sufficient, but not necessary, condition for material to avoid being deemed discarded.

¶ 34 Defendant argues that, like the containers in *Alternate Fuels*, the wood chips (and other materials) are "collected, processed, and returned to the economic mainstream" as useful and necessary products for defendant's operations. Clearly, however, the materials used by defendant as alternate daily cover or road base are not "returned to the economic mainstream" in the same manner as the plastic containers that were rinsed, shredded, and then sold by AFI to Illinois Power. As such, those materials cannot avoid being deemed discarded if that question turns on whether they have been returned to the economic mainstream. But, as explained, the holding in *Alternate Fuels* does not end our inquiry, as the possibility remains open that the materials here are otherwise not discarded material.

¶ 35 The parties also point to *Lincoln*, 383 Ill. App. 3d 198, another case concerning the definition of "waste" under the Act. In *Lincoln*, the defendants operated a business that accepted material that it eventually "mounded into a pile spanning over 26 acres and 70 feet in height." *Id.* at 199-200. They claimed that they intended to use the mound to construct an "all-seasons downhill skiing and snowboarding facility." *Id.* at 200. The defendants argued that various exceptions removed the mound from the definition of "waste," including that the material had been "separated or processed and returned to the economic mainstream in the form of raw materials or products." See 415 ILCS 5/3.160(b) (West 2006). After the trial court granted partial summary judgment, the defendants filed an interlocutory appeal pursuant to Illinois Supreme Court Rule 308 (eff. Feb. 1, 1994), certifying the following question:

> " 'Whether clean construction and demolition debris deposited onto the land for the purpose of providing the infrastructure for a recreational facility to be built at the site and to be used for snow skiing/snow boarding (facts which are undisputed for purposes of the August 4, 2007 partial summary judgment order) constitutes "waste" under the Illinois

Environmental Protection Act and requires a permit in compliance with the Act's waste

disposal requirements including but not limited to 415 ILCS 5/3.305, 415 ILCS 5/21

*et seq.*, 415 ILCS 5/21.1 and 35 Ill. Adm. Code 812.101(a).' " *Lincoln*, 383 Ill. App. 3d at

203.

Clean construction debris is excepted from the definition of "waste" under section 3.160 if it is

"separated or processed and returned to the economic mainstream in the form of raw materials or

products." 415 ILCS 5/3.160(b) (West 2006).

¶ 36　　The *Lincoln* court, after determining the material did not meet the statutory requirement

that it be "separated or processed" (415 ILCS 5/3.160(b) (West 2006)), addressed whether the

material the defendant had accumulated had been "returned to the economic mainstream." *Lincoln*,

383 Ill. App. 3d at 206. It noted that the defendant was "not returning the material to the stream of

commerce when it permanently ke[pt] the material on site for its own use." *Id.* It rejected the

defendant's reliance on its proposed development as speculative. *Id.* at 207. Further, it

distinguished *Alternate Fuels*, noting that, unlike AFI, the defendant's "activities do not include a

commercial transaction with a third party concerning a newly created raw material or product."

¶ 37　　Thus, defendant here, like the defendant in *Lincoln*, did not engage in a commercial

transaction with a third party and instead kept the material on its site for use as alternate daily

cover and road base. In accordance with *Lincoln*, it is clear that defendant has not returned any of

the materials at issue in this case to the economic mainstream. It does not, therefore, avoid being

deemed "waste" on that basis. The question is whether it otherwise remains outside the definition

of "waste."

¶ 38　　To begin with, we do not regard "other discarded material" to be ambiguous. It is apparent

to us that the supreme court did not regard the terms "waste" and "discarded" as ambiguous in

*Alternate Fuels*. To explain its use of section 3.380 to ascertain the meaning of "discarded," the court invoked the principle that "words and phrases should not be construed in isolation, but must be interpreted in light of other relevant provisions of the statute." *Id.* at 238. Nowhere does the opinion mention the *in pari materia* doctrine. A statute must be found ambiguous before reliance on the *in pari materia* rule is warranted. See *People v. Rowell*, 2020 IL App (4th) 190231, ¶ 17. The principle that a statute should be read as a whole is part of the initial inquiry in ascertaining a statute's meaning, and its invocation does not require a finding that an ambiguity exists (though this principle may be relied upon if a statute is ambiguous as well (see *People v. Rinehart*, 2012 IL 111719, ¶ 26)). See *Rowell*, 2020 IL App (4th) 190231, ¶ 16.

¶ 39    Neither party attempts to establish that "discarded" is not clear. Hence, we must look to the plain meaning of the phrase. *Hobby Lobby Stores, Inc.*, 2021 IL App (2d) 190362, ¶ 20. In such circumstances, it is appropriate to consult a dictionary. *Capron Rescue Squad District v. North Boone Fire Protection District No. 3*, 2019 IL App (2d) 190355, ¶ 29. Pertinent here, "discard" is defined as "to drop, dismiss, let go, or get rid of as no longer useful, valuable, or pleasurable." Webster's Third New International Dictionary 644 (2002). Keeping in mind that whether material is discarded is assessed with regard to the material itself, rather than from the perspective of the generator of the material (*Alternate Fuels*, 215 Ill. 2d at 239), and in light of the plain meaning of "discard," it is apparent that the material that defendant is using as alternate daily cover and road base is not "no longer useful" and therefore has not been "discarded." See also 35 Ill. Adm. Code 807.104 (1985) (defining "Cover material" as "material that is used to cover compacted solid waste in a sanitary landfill"). In turn, it is not "waste" as defined by the Act, and it is not subject to the tipping fee for waste set forth in sections 22.15 and 22.44. See 415 ILCS 5/22.15, 22.44 (West 2022).

¶ 40 Plaintiffs' argument about defendant's failure to seek a beneficial use determination is unavailing. Section 22.54 (which provides for a beneficial use determination) allows "a material otherwise required to be managed as waste [to] be managed as non-waste." It has no application here because the material is not waste in the first instance. See 415 ILCS 5/22.54 (West 2022). Also, since the statute is not ambiguous, plaintiffs' reliance on the terms of the permit under which defendant was operating is misplaced.

¶ 41 Although we have found that the statutory terms at issue here are not ambiguous, we note, nevertheless, that our conclusion is consistent with IEPA practice on this issue. As a practical matter, the IEPA appears to have never actually collected fees in the manner advocated by plaintiffs. The IEPA did not attempt to collect the fee until it issued a violation notice to defendant and other landfills in 2019. After receiving defendant's response, the IEPA declined to pursue the matter further. We also note that the IEPA has not sought to intervene in this case.

¶ 42 In sum, we hold that the plain meaning of "discard" and, in turn, "waste" does not encompass the sort of materials defendant uses as alternate daily cover and road base. We affirm this portion of the trial court's judgment.

¶ 43                                     B. Pollution Control Waste

¶ 44 Generally, "pollution control waste" is exempt from the tipping fee. *Id.* §§ 22.15(k)(2), 22.44(c)(2). Plaintiffs argue that when pollution control waste is certified by its generator as "non-special waste," it is no longer entitled to the exemption. The plain language of the Act does not support plaintiffs' position.

¶ 45 Plaintiffs point out that "pollution control waste" is defined as

"any liquid, solid, semi-solid or gaseous waste generated as a direct or indirect result of the removal of contaminants from the air, water or land, and which pose a present or potential

threat to human health or to the environment or with inherent properties which make the disposal of such waste in a landfill difficult to manage by normal means." *Id.* § 3.335. "Pollution control waste" is a subcategory of "special waste." *Id.* § 3.475(c). "Special waste" is subject to enhanced record-keeping and handling requirements. See, *e.g.*, *id.* § 21(g)(1); see also 35 Ill. Adm. Code 809.Subpart D; 35 Ill. Adm. Code 811.Subpart D. In appropriate circumstances, the generator of the waste may certify that it is "non-special." See 415 ILCS 5/22.48 (West 2022). Where the waste is certified as "non-special," it need not be managed as "special waste." *Id.* § 22.48(a). Thus, plaintiffs reason, since pollution control waste certified as "non-special waste" is not subject to enhanced handling and record-keeping requirements, there is no reason to exempt it from the tipping fee.

¶ 46     A closer examination of the relevant statutes exposes the flaw in plaintiffs' reasoning. The generator of waste must first determine whether the waste at issue is "special." See *id.* § 3.475(c); 35 Ill. Adm. Code 808.121 (2010). Included within the definition of "special waste" is pollution control waste. 415 ILCS 5/3.475(c) (West 2022). Where the waste is found to be pollution control waste, the generator must make a further determination as to whether it is "non-special":

" 'Special waste' means any of the following:

* * *

(c) industrial process waste or pollution control waste, except:

(1) any such waste certified by its generator, pursuant to Section 22.48 of this Act, not to be any of the following:

(A) a liquid, as determined using the paint filter test set forth in subdivision (3)(A) of subsection (m) of Section 811.107 of Title 35 of the Illinois Administrative Code;

(B) regulated asbestos-containing waste materials, as defined under the National Emission Standards for Hazardous Air Pollutants in 40 CFR Section 61.141;

(C) polychlorinated biphenyls (PCB's) regulated pursuant to 40 CFR Part 761;

(D) an industrial process waste or pollution control waste subject to the waste analysis and recordkeeping requirements of Section 728.107 of Title 35 of the Illinois Administrative Code under the land disposal restrictions of Part 728 of Title 35 of the Illinois Administrative Code; and

(E) a waste material generated by processing recyclable metals by shredding and required to be managed as a special waste under Section 22.29 of this Act[.]" 415 ILCS 5/3.475(c)(1) (West 2022).

Thus, this statute removes five specific types of pollution control waste from the category of special waste.

¶ 47 It is apparent that other sorts of pollution control waste may exist that fall within the definition of "special waste." Notably, section 22.48 makes room for this possibility:

"An industrial process waste or pollution control waste not within the exception set forth in subdivision (2) of subsection (c) of Section 3.475 of this Act must be managed as special waste unless the generator first certifies in a signed, dated, written statement that the waste is outside the scope of the categories listed in subdivision (1) of subsection (c) of Section 3.475 of this Act." *Id.* § 22.48(a).

The plain language of this passage indicates that there is pollution control waste that must be managed as special waste that exists outside the exceptions set forth in section 3.475(c)(1). It states that pollution control waste certified as being within one of the exceptions need not be managed as special waste, but pollution control waste not certified as being within one of the exceptions must be managed as special waste. Thus, it contemplates pollution control waste that exists outside of any of the exceptions. Moreover, this statute does not state that the non-special waste otherwise loses its status as pollution control waste if it falls within an exception. That is, whether or not the waste falls within an exception to special waste, the waste at issue remains pollution control waste.

¶ 48    The legislature has exempted all pollution control waste from the tipping fee. See *id.* §§ 22.15(k)(2), 22.44(c)(2). This exemption is based on the waste's status as pollution control waste; non-special waste is not mentioned. See *id.* §§ 22.15(k)(2), 22.44(c)(2). Had the legislature intended to exclude pollution control waste that had been certified by its generator as non-special from the exemption, it could have easily said so in these statutes. We, of course, are not free to "add[ ] unstated exceptions, conditions, or limitations to the language of a statute." *Manago v. County of Cook*, 2017 IL 121078, ¶ 33. Hence, we are compelled to reject plaintiffs' request for us to limit the fee exception to pollution control waste that has not been certified as non-special. We note that the plain language of the Act is consistent with the position expressed in the Nechvatal letters.

¶ 49    Plaintiffs also argue that the burden should be placed on a landfill to show that "if the waste has been certified as non-special, then the landfill operator will have to show a threat to human health or the environment before it may be shown to be pollution control waste and hence exempt." Plaintiffs point out that the definition of pollution control waste is waste that "pose[s] a present or potential threat to human health or to the environment or with inherent properties which make the

disposal of such waste in a landfill difficult to manage by normal means." 415 ILCS 5/3.335 (West 2022). Since non-special waste is not subject to enhanced management requirements (see *id.* § 22.48(a)), plaintiffs reason, it is not "difficult to manage by normal means" (*id.* § 3.335). Accordingly, plaintiffs conclude that a landfill operator should have to show that the waste falls within the other prong of the definition of pollution control waste to be entitled to the exemption—specifically, that the waste "pose[s] a present or potential threat to human health or to the environment." *Id.* We disagree.

¶ 50     The IEPA has placed on the generator of waste the responsibility of "determin[ing] whether the waste is a special waste." See 35 Ill. Adm. Code 808.121(a) (2010). This entails ascertaining whether the waste is pollution control waste and, in turn, whether, if it is pollution control waste, it is exempt, non-special waste. See 415 ILCS 5/3.475 (West 2022). Thus, prior to waste even arriving at a landfill, it has been classified as pollution control waste. We find plaintiff's argument to the contrary unpersuasive in light of these enactments. Plaintiffs point to no statute or regulation that would require a landfill operator to again classify this waste that has already been classified.

¶ 51     In short, we reject plaintiffs' argument on this point and affirm this portion of the trial court's judgment as well.

¶ 52                              IV. CONCLUSION

¶ 53     In light of the foregoing, the judgment of the circuit court of Lake County is affirmed.

¶ 54     Affirmed.

*Solid Waste Agency of Lake County v. Zion Landfill, Inc.*, **2026 IL App (2d) 250024**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 22-MR-423; the Hon. Charles W. Smith, Judge, presiding. |
| **Attorneys for Appellant:** | Eric F. Rinehart, State's Attorney, of Waukegan (Karen D. Fox, Assistant State's Attorney, of counsel), and Derke J. Price and Mary Jean Dolan, of Ancel Glink, P.C., of Chicago, for appellants. |
| **Attorneys for Appellee:** | Philip L. Comella and Ryan G. Rudich, of Taft Stettinius & Hollister LLP, of Chicago, for appellee. |